UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
CINCINNATI

| | |
|---|---|
| XIAFEN "SHERRY" CHEN : | |
| : | Case No. _____ |
| 1438 Meadow Ridge Circle : | |
| Wilmington, OH  45177 : | Judge _____ |
| : | |
| Plaintiff, | |
| : | |
| : | **COMPLAINT** |
| vs. : | |
| : | |
| UNITED STATES OF AMERICA | |
| : | |
| Defendant. : | |

## I.    NATURE OF ACTION AND SUMMARY OF CLAIMS

1. This is an action brought under the FTCA for the malicious prosecution and false arrest of Sherry Chen.

2. On October 20, 2014, Xiafen "Sherry" Chen's world was turned upside down. Shortly after arriving at work, she was suddenly arrested by six FBI agents.

3. A naturalized U.S. citizen from China, Ms. Chen had been a loyal and dedicated employee at the National Weather Service's Ohio River Forecast Center in Wilmington, Ohio.

1

4. An acclaimed scientist, Ms. Chen served the National Weather Service as a hydrologist, whose flood forecast model and hard work literally saved lives during the historic flood of the Ohio and Mississippi Rivers in 2011.

5. Entirely based on a number of innocuous questions that Ms. Chen asked a colleague, on May 24, 2012, the colleague wrote an e-mail to US Army Corps Engineers Division of Security that falsely accused this "Chinese national" of seeking sensitive information that would betray U.S. national security interests with the intent of sharing this information with the Chinese government.

6. This information was neither secret or sensitive.

7. One glance at the information would have shown it was not as described by Ms. Chen's colleague. Even a cursory investigation would have led to Ms. Chen's immediate exoneration as she had done nothing wrong. Ms. Chen never betrayed national security interests or shared secret information, nor did she have any intent to share such information. Ms. Chen had been honored for her service to our nation and is a proud U.S. citizen.

8. However, this was the just of beginning of an effort to find crimes committed by Ms. Chen without any basis in fact or the law after she was labeled a "Chinese national."

9. At the agency, the Office of Security was determined to find Ms. Chen guilty of a crime and it prepared a maliciously false report detailing Ms. Chen's alleged misconduct and, in doing so, ignored and then failed to disclose exculpatory evidence.

10. The false, misleading and malicious report laid the foundation for Ms. Chen's indictment and arrest by the Federal Bureau of Investigation ("FBI") in October 2014.

11. In light of the nature of the charges and the circumstance of her arrest, Ms. Chen became the subject of countless news reports declaring her an alleged spy for China.

12. The charges and allegations against her were entirely false.

13. In March 2015, nearly five months after her arrest and a week before her scheduled trial, the United States voluntarily dismissed all of the charges against Ms. Chen, without explanation or apology.

14. However, as a direct result of the unjust arrest and prosecution, Ms. Chen's hard-earned reputation and career were destroyed.

15. She has never been allowed to return to the work which she dedicated her entire adult life to pursuing with recognized excellence and in service to our nation, Sherry's nation.

16. The malicious lies, patently false, never proven, took on a life of their own and one that took the professional life and reputation of an American who dedicated her life to keeping our citizens safe and saved lives through science.

17. For her Complaint under the Federal Tort Claims Act, Ms. Chen states claims of malicious prosecution and false arrest, as follows:

## II. PARTIES/JURISDICTION/VENUE

18. Plaintiff, Xiafen "Sherry" Chen, currently resides at the address listed in the caption.

19. The United States of America is the proper defendant in this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq*.

20. The United States Department of Commerce is a Federal agency, under 28 U.S.C. § 2671.

21. The Department of Commerce is comprised of a number of bureaus and activities, including the National Oceanic and Atmospheric Administration (NOAA), and within NOAA is the National Weather Service (NWS) for whom Plaintiff worked.

22. The Department of Commerce employs investigative agents who work for the department's Office of Security. These agents, including the agents specifically identified herein, carry the job title of "Special Agent Criminal Investigator" and are empowered by law to execute searches, to seize evidence, and to make arrests for violations of Federal law.

23. The Office of Security agents identified herein are considered "investigative or law enforcement officers" pursuant to 28 U.S.C. § 2680(h).

24. At all times relevant hereto, the Office of Security agents identified herein were acting within the scope of their employment with the Department of Commerce.

25. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331.

26. Venue is proper in this Court because Plaintiff resides in this judicial district and the acts or omissions complained of herein occurred, in part, in this judicial district. *See* 28 U.S.C. § 1402.

### III. FACTS – Ms. Chen was a Decorated Scientist at the National Weather Service

27. Ms. Chen was born in China. After obtaining bachelor's and master's degrees in hydrologic engineering in China, she immigrated to the United States in 1992.

28. She continued her studies in the U.S. and obtained a second master's degree in water resources and climatology from the University of Nebraska.

29. In 1997, Ms. Chen became a naturalized citizen of the U.S.

30. After a dozen years working for the State of Missouri as a hydrologist, in 2007 she was hired by the NWS to serve as a hydrologist in its Ohio River Forecast Center (ORFC) in Wilmington, Ohio.

31. Ms. Chen was a stellar employee with the NWS. She had a spotless record — no disciplinary warnings of any kind — during her years of service.

32. One of her primary job duties was to develop a forecast model for floods. The model's focus was the Ohio River and its tributaries.

33. She received many accolades for this important work.

34. For example, in June 2011, Ms. Chen was recognized for her work calibrating and implementing the model in connection with the historic flooding of the Ohio and Mississippi Rivers in 2011. In a "Recommendation for Recognition," Ms. Chen's then-direct supervisor lauded her for her "tireless" and "outstanding" work that "produced positive results of national significance during this historical event."

35. Further, in a ceremony in Birmingham, Alabama, Ms. Chen was chosen to receive a special award bestowed upon the ORFC for the "lifesaving river forecasts" made during the 2011 record flooding.

36. Ms. Chen consistently received positive feedback from her supervisors about her excellent job performance during her tenure at NWS, including an outstanding annual review received from her supervisor on October 19, 2014.

37. The next day, the FBI arrested her at the Wilmington office.

### IV. An Unfounded Accusation Against Ms. Chen Triggers an Extensive, Years-Long Investigation

38. While she did not know it at the time, Ms. Chen's troubles began two and half years earlier, on May 24, 2012.

39. That day she, made a telephone call to Deborah Lee, then the Chief of the Water Management Division for the U.S. Army Corps of Engineers (USACE). Ms. Lee was not a stranger to Ms. Chen as the two had periodically worked together over the years. Ms. Chen told Ms. Lee she had been to China recently on a trip to visit family, and that while there she had a brief meeting with a former classmate, who worked in the same field as Ms. Chen. He asked her a few questions about U.S. dams that she could not answer. Because Ms. Chen was embarrassed that she could not answer questions that she regarded as very basic, she decided to seek answers to these questions after she returned to the U.S. and asked Ms. Lee if she could provide answers.

40. Ms. Lee did not have specific answers, but she referred Ms. Chen to the USACE website. Ms. Chen thanked Ms. Lee for her help. The telephone call was brief and unremarkable.

41. However, unbeknownst to Ms. Chen, immediately after the call Ms. Lee emailed the USACE Division of Security and reported Ms. Chen as a potential security threat. In her email, Ms. Lee asserted that she was "concerned that an effort is being made

6

to collect" purportedly secret USACE information "by a foreign interest" – namely, the Chinese government.

42. Ms. Lee, who is Caucasian and U.S.-born, pointedly noted in her email that Ms. Chen, while a U.S. citizen, was a "Chinese national."

43. The suggestion that Ms. Chen was involved in a conspiracy with the Chinese government to obtain purportedly confidential information of the USACE was without supporting facts. Ms. Chen made clear to Ms. Lee that she was looking for *publicly available* information. Also, Ms. Chen expressly told Ms. Lee that she was looking for information for a colleague *in China,* a fact that presumably an alleged spy for the Chinese government would not disclose.

44. Notwithstanding the patently false accusations contained in Ms. Lee's e-mail and the openly racist language, Lee's e-mail prompted an extensive investigation of Ms. Chen by the Department of Commerce's Office of Security.

45. On June 11, 2013, two Office of Security agents, Lead Agent Andrew Lieberman and Agent Michael Benedict, arrived at the Wilmington office as part of their investigation of Ms. Chen.

46. Without prior warning to Ms. Chen, the agents interviewed her for hours. She answered all of their questions without the benefit of counsel.

47. During the hours-long interview, Ms. Chen patiently explained the background of her May 24 telephone call to Ms. Lee and her trip to China that had preceded it.

48. In the spring of 2012 Ms. Chen had traveled to Beijing, China to visit her elderly parents. During the trip, she briefly met with a former classmate, Jiao Yong, who held a position with the Chinese government in the area of water resources. The meeting

7

with Mr. Jiao was a favor to Ms. Chen's nephew, whose father-in-law had a longstanding dispute with the local water bureau over a water pipeline project. Her nephew had asked Ms. Chen to meet with Mr. Jiao in the hopes that his father-in-law would be paid for work done on this project.

49. Ms. Chen met with Mr. Jiao at his office in Beijing for approximately fifteen minutes. At the end of the meeting, they briefly chatted about their respective jobs, since they were both in the same profession. Mr. Jiao asked if she knew how the U.S. federal and local governments shared costs in funding their dams. He also asked if she knew the total water volume for the U.S. In Ms. Chen's view these were simple and basic questions for someone in their profession. Even though they were only causally asked as "by the way" questions, she was embarrassed to not know the answers. She told him she would track down the answers when she returned to the U.S.

50. Upon her return to the U.S. in May 2012, Ms. Chen tried to quickly find public information online to answer Mr. Jiao's questions, although this proved difficult. On May 11, she reached out via email to her supervisor, Trent Schade, and subsequently called Ms. Lee on May 24. At all times she made clear she was looking for public information.

51. That month she sent Mr. Jiao four emails, only two of which were substantive, in which she provided him information she had found online, including information copied-and-pasted from the USACE's public website as Ms. Lee had directed.

52. All of Ms. Chen's emails to Mr. Jiao contained only publicly available information.

53. At the end of the June 11, 2013 interview, Ms. Chen provided to the Office of Security agents copies of every one of these emails.

54. Thus, as of June 11, 2013, the Office of Security agents knew that Ms. Chen had sought and provided to Mr. Jiao only publicly available information.

55. In other words, it was clear to the Office of Security agents that Ms. Chen had not shared any secret or otherwise confidential information with Mr. Jiao or, for that matter, anyone outside of the agency.

56. The alleged conspiracy between Ms. Chen and the Chinese government, concocted in Ms. Lee's imagination, plainly did not exist.

57. Nevertheless, on or about October 16, 2014, Ms. Chen was indicted for multiple violations of federal law, including alleged "[un]authorized access" of a government database and "steal[ing] . . . computerized fields of data."

## V. The Office of Security Prepares a Maliciously False Report of Investigation, Leading to Ms. Chen's Indictment and Arrest

58. While the investigation of Ms. Chen should have ended immediately after the June 11, 2013 interview, the Office of Security forged ahead.

59. On or about June 3, 2014, Lead Agent Lieberman completed a Report of Investigation ("Report").

60. Agent Lieberman knew that the Report would be shared with the FBI.

61. Agent Lieberman knew that a prosecutor would review the Report and the evidence submitted with it.

62. The Report was littered with false and misleading statements and material omissions regarding Ms. Chen's conduct in May 2012.

63. In the Report, Agent Lieberman accused Ms. Chen of improperly accessing the USACE's National Inventory of Dams (NID) database and downloading files from it

9

for the purpose of sharing secret information about U.S. dams with the Chinese government.

64. This allegation was completely false.

65. Agent Lieberman knew that Ms. Chen had, in fact, properly accessed the NID database in May 2012 for job-related reasons.

66. Agent Lieberman specifically knew that Ms. Chen had accessed the NID database on May 10, 2012, with the assistance of her co-worker, Ray Davis.

67. Mr. Davis was considered the leader of the Wilmington office's "Dam Break Working Group." In this role Mr. Davis needed to access the NID database if a dam break occurred, and he had been directed to train his co-workers, from time to time, about how to navigate the NID database in the event he was absent during such an emergency. For this reason he recorded the username and password for the NID database in a binder that he kept in the office and was readily available to his co-workers.

68. On May 10, in response to an inquiry by Ms. Chen on about the NID database, Mr. Davis provided Ms. Chen the username and password. He then assisted Ms. Chen in logging onto the database and gave her a personal tour, which lasted eleven minutes.

69. As part of this training session, Ms. Chen downloaded a document that contained information about dams in Ohio, which was saved as "OH" on her computer. Given that her area of responsibility for the forecast model included Ohio, Ms. Chen had hoped the information on the database would have valuable information for her forecast model, which had more than 30 dams in it. But she found that it did not, as the information was outdated and unhelpful.

10

70. Ms. Chen shared this downloaded NID file with no one, let alone Mr. Jiao, which the agents fully knew but did not mention in the Report.

71. Critically, the Report also omitted the fact that during the agents' June 11, 2013 interview with Mr. Davis, the same day as Ms. Chen's interview, Mr. Davis gave the agents multiple reasons for why Ms. Chen would access the NID database for *job-related* reasons.

72. For example, Mr. Davis told the agents that the information in the database could have been useful and helpful to Ms. Chen. He also told them that, as part of her job, Ms. Chen had a need to obtain data and using the NID database would make it easier.

73. On a direct question from Agent Lieberman, Mr. Davis told him that Ms. Chen's access of the NID database would fall within the scope of her job.

74. None of these statements by Mr. Davis were mentioned in the Report.

75. Also, Mr. Davis told Agent Lieberman about the existence of the binder and that he shared the NID username and password with other co-workers, although this fact likewise was intentionally omitted from the Report. Instead, the Report suggested that Ms. Chen had improperly obtained "Davis' credentials" to access the NID database.

76. While the Report included as attachments several memoranda reflecting the agents' interviews with other witnesses, the 11 pages of handwritten notes of Mr. Davis's June 11 interview also were not made part of the Report.

77. On information and belief, the Office of Security never shared the handwritten notes of Mr. Davis's June 11 interview with the FBI or the United States Attorney's Office for the Southern District of Ohio before Ms. Chen's arrest.

78. The Report did include a copy of a "Memorandum of Investigation" (MOI) for Ms. Chen's June 11 interview, although the MOI was not an accurate reflection of Ms.

11

Chen's statements during the lengthy interrogation. In at least one instance, the MOI reflected an alleged damning admission by Ms. Chen – *i.e.*, that she had accessed the restricted NID database to find information for Mr. Jiao – which was flatly inconsistent with the agents' handwritten notes of the interview. Ms. Chen had said no such thing.

79. The misleading and false statements and material omissions in the Report directly led to Ms. Chen's subsequent indictment and arrest four months later.

### VI. The Malicious Prosecution Begins

80. On October 20, 2014, Ms. Chen reported to work, thinking it was like any other day.

81. Upon entering the building shortly before noon, she noticed that a number of employees were loitering and quietly chatting in the hallways, which seemed unusual.

82. Shortly after greeting her co-workers, Ms. Chen was approached by her supervisor, Mr. Schade, who asked her to come to his office. She went with him, thinking he might have some paperwork for her to sign in connection with the annual performance review she received the day before.

83. That, however, was not his purpose. Once they entered his office, Mr. Schade told her, "Someone wants to talk to you."

84. At that moment, six FBI agents burst into his office from an adjacent conference room.

85. One of the agents showed her an arrest warrant, as a second agent slapped handcuffs on her wrists. A third agent, whom Ms. Chen would later learn was the FBI regional supervisor, searched Ms. Chen's pockets. The remaining agents were spread out throughout the room.

86. One of the agents read aloud to her the indictment and then the Miranda warnings. In a state of shock, she asked them to read the indictment again. She could not process what was happening.

87. With her hands handcuffed behind her back, the agents walked Ms. Chen out of Mr. Schade's office, past her co-workers, and into the parking lot.

88. The agents then placed her in the backseat of an FBI vehicle. Once in the car, Ms. Chen could see her co-workers watching this scene through the office windows. She was overwhelmed with feelings of shame.

89. When they arrived at the courthouse, one of the agents showed his badge to the gatekeeper. Asked about his purpose, the agent told him they were dropping off a "prisoner." Ms. Chen could not believe what she heard.

90. The reality of what was happening to Ms. Chen sunk in as she entered the courthouse and, one by one, heavy metal doors shut behind her.

91. After being held briefly in a solitary cell, she then was subjected to various indignities: she was fingerprinted, her mouth was swabbed for a DNA sample, and a security bracelet was affixed to her ankle.

92. Led to the courtroom in handcuffs, Ms. Chen appeared in court where the prosecutor read aloud the indictment and announced that the maximum penalty was 25 years in prison and $1 million in fines. She was terrified.

93. Released after the hearing, Ms. Chen's husband picked her up at the courthouse and took her home. But there was no respite from the madness.

94. Shortly after arriving at home, there was a knock at her front door. She opened the door and a reporter from a local television station introduced himself and

13

asked for her comment on the indictment. She told him she had nothing to say and quickly shut the door.

95. Yet more reporters came to her house and the knocking on her door continued. She did not open the door again. She closed the curtains.

96. She peered out her windows and saw that TV trucks were parked outside her house and cameramen were shooting footage of her home.

97. She also could see that reporters were visiting her neighbors' homes and asking them questions. This continued even as night fell.

98. Watching the television news that evening, she saw multiple stories about her arrest, which included interviews of her neighbors who expressed their shock.

99. The ensuing media coverage of her arrest and prosecution produced countless news stories, including an article in the Cincinnati Enquirer, published on or about January 9, 2015, titled, "Wilmington scientist accused of spying for Chinese." (A copy of the Enquirer article is attached herewith as "Exhibit A").

100. Her reputation destroyed, she anxiously awaited trial as she and her family incurred substantial attorney fees.

101. In the meantime she was without a salary, as NWS had suspended her, effective November 24, 2014.

102. Ms. Chen was steadfast in maintaining her innocence and refused to plead guilty to a lesser charge even though she was terrified about the approaching trial. Nearly five months after her arrest and only one week before her trial was scheduled to begin, the U.S. Attorney for the Southern District of Ohio announced, on or about March 10, 2015, that the government was voluntarily dismissing all of the charges against her.

103. The U.S. Attorney offered no explanation or apology.

104. Despite the dismissal of the indictment, NOAA immediately initiated their own disciplinary investigation, citing principally the same false allegations that had formed the indictment.

105. On March 10, 2016, the agency terminated her employment.

106. Ms. Chen challenged the termination through an appeal with the U.S. Merit Systems Protection Board.

107. After a three-day evidentiary hearing in Cincinnati in March 2017, Chief Administrative Judge Schroeder issued a 120-page ruling on April 23, 2018, ordering Ms. Chen's reinstatement. A copy of the MSPB decision can be found online, including through this link: https://fas.org/sgp/news/2018/04/mspb-chen.pdf.

108. Agreeing with Ms. Chen that she had been the "victim of a gross injustice," Judge Schroeder was highly critical of the Department of Commerce for its handling of the investigation leading to her arrest and subsequent termination of employment.

109. Commenting on Agent Lieberman's conclusion that Ms. Chen accessed the NID database "as a result of the request" by Mr. Jiao, the judge wrote, "[I]t is inconceivable (and I do not find credible) how . . . Agent Lieberman could reach [this] conclusion." She further asserted that "it is equally inconceivable" why the agents did not formally memorialize their 11 pages of interview notes with Ray Davis and attach them to the Report, since "[t]he responses from Mr. Davis to Agent Lieberman's questions were directly relevant to the material issues," including the "work-related reasons why Ms. Chen accessed the NID" database.

110. The agency appealed Judge Schroeder's ruling, and its appeal is currently pending before the MSPB Board in Washington, D.C.

111. Since Judge Schroeder's ruling the Department of Commerce has reinstated Ms. Chen's salary and benefits, as is required by MSPB rules during an appeal, but it has steadfastly refused to allow Ms. Chen to return to work.

### VII. Ms. Chen's Exhaustion of Administrative Remedies

112. Through counsel Ms. Chen timely filed an administrative tort complaint with the Department of Commerce on or about October 18, 2016 and subsequently amended her complaint in April 2017.

113. By letter of July 25, 2018, the government advised the undersigned counsel for Ms. Chen that it was denying her claim. (A copy of the July 25, 2018 letter is attached herewith as "Exhibit B.")

114. Ms. Chen has timely commenced this action.

### VIII. FIRST CLAIM FOR RELIEF – Malicious Prosecution

115. Plaintiff incorporates the allegations set forth above as if fully restated herein.

116. The Department of Commerce's Office of Security agents, and potentially other employees, knowingly made false or misleading allegations to law enforcement authorities regarding Plaintiff's conduct described herein that directly led to her indictment and subsequent prosecution.

117. The Department of Commerce's Office of Security agents, and potentially other employees, instigated and encouraged the prosecution of Plaintiff.

118. On information and belief, one or more of the Department of Commerce's Office of Security agents testified or otherwise participated during the grand jury proceedings against Plaintiff.

119. On information and belief, one or more of the Department of Commerce's Office of Security agents assisted the prosecutors in the United States Attorney's Office for the Southern District of Ohio in their preparation for trial, including but not limited to being willing and available to testify as trial witnesses, in the criminal case against Plaintiff.

120. The prosecution against Plaintiff was not supported by probable cause.

121. The prosecution was terminated on March 11, 2015, when the court granted the government's motion to dismiss the indictment.

122. The actions of the individuals described herein constitute malicious prosecution under Ohio law.

123. As a direct and proximate result of the foregoing conduct, Plaintiff has suffered damages for which she is entitled to recover against the United States of America, which is liable under the FTCA.

### IX. SECOND CLAIM FOR RELIEF – False Arrest

124. Plaintiff incorporates the allegations set forth above as if fully restated herein.

125. The actions of the Department of Commerce's Office of Security agents, and potentially other employees, directly led to Plaintiff's unjustified arrest and detention without legal justification.

126. The Department of Commerce's Office of Security agents, and potentially other employees, instigated and encouraged the unjustified arrest and detention of Plaintiff.

127. These individuals acted maliciously in causing Plaintiff's unjustified arrest and detention, and their actions described herein constitute false arrest under Ohio law.

128. As a direct and proximate result of the foregoing conduct, Plaintiff has suffered damages for which she is entitled to recover against the United States of America, which is liable under the FTCA.

## Prayer for Relief

WHEREFORE, Plaintiff demands judgment against the United States of America, in an amount to be determined at trial, as follows:

A. That Plaintiff be awarded compensatory damages, including for emotional distress, pain and suffering, and loss of reputation;

B. That Plaintiff be awarded damages for her lost pay and benefits resulting from her unpaid suspension following her arrest from November 24, 2014 through March 12, 2015;

C. That, alternatively, Plaintiff further be awarded her lost pay and benefits following her termination, effective March 10, 2016, through April 23, 2018, the date of the MSPB judge's ruling in her favor, only to the extent that such ruling is overruled or otherwise not enforced;

D. That Plaintiff be awarded for the "loss of property" by being required to render funds to defend against the legal proceedings as a consequence of the initial false arrest and malicious prosecution;

E. That Plaintiff be awarded for the injury of being subjected to arrest, indictment, and legal proceedings;

F. That Plaintiff be awarded such other and further relief which the Court deems just, proper and equitable under the circumstances.

Respectfully submitted,

/s/ Michele L. Young (0062011)
Trial Attorney for Plaintiff
Michele L. Young Co., LPA
8525 Given Road,
Cincinnati, OH 45243
Tel: (513) 617-9152
michele@michelelyounglaw.com

Peter Toren – Member NY, DC, and Cal Bars (Not yet admitted in S.D. Ohio)
3028 Newark Street, NW
Washington, D.C. 20008
Tel: (646) 623-4654
ptoren@petertoren.com