**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**
**CINCINNATI**

| | | |
|---|---|---|
| XIAFEN "SHERRY" CHEN | : | Case No. 1:19-CV-00045 |
| 1438 Meadow Ridge | | |
| Circle Wilmington, | : | District Judge Timothy S. Black |
| Ohio 45177 | | |
| | : | |
| Plaintiff, | | |
| | : | **[PROPOSED] FIRST AMENDED** |
| vs. | | **COMPLAINT AND JURY** |
| | : | **DEMAND** |
| UNITED STATES OF | | |
| AMERICA | : | |
| | | |
| | : | |
| DEBORAH LEE | | |
| National Oceanic and Atmospheric | : | |
| Administration-Great Lakes | | |
| Environmental Research Laboratory | : | |
| 4840 S. State Road | | |
| Ann Arbor, Michigan 48108 | : | |
| *In Her Individual Capacity* | | |
| | : | |
| ANDREW LIEBERMAN | | |
| United States Department of | : | |
| Commerce 1401 Constitution Ave | | |
| NW Washington, DC 20230 | : | |
| *In his Individual Capacity* | | |
| | : | |
| MIKE BENEDICT | | |
| United States Department of | : | |
| Commerce 1401 Constitution Ave | | |
| NW Washington, DC 20230 | : | |
| *In his Individual Capacity* | | |
| | : | |
| RENEE DESROSIERS | | |
| United States Department of | : | |
| Commerce 1401 Constitution Ave | | |
| NW Washington, DC 20230 | : | |
| *In her Individual Capacity* | | |
| | : | |
| "John & Jane Does" | | |
| | : | |
| Defendants. | | |

**Table of Contents**

Introduction.................................................................................................. ………3

Summary of Claims…………………………………………………………………9

Jurisdiction and Venue…………………………………………………………....9

Parties.......................................................................................................... ………10

Facts .........................................................................................................………12

*Sherry Chen was a decorated scientist*.......................................................…………12

*The United States prosecuted other Chinese-American Scientists based on their race and ethnity*
……………………………………………………………………………………20

*Defendants Lieberman and Benedict investigate Ms. Chen's use of the pooled password kept in a common folder for use by all employees, selectively prosecuted Ms. Chen only for use of the password, failed to interview other password users, and ignored ex- culpatory evidence…* ....20

*Defendants Lieberman and Benedict Draft a Maliciously False ROI Causing Ms. Chen's Indictment and Arrest* ...................................... ………………………………………….…25

*On information and belief, Defendants Lieberman and Benedict selectively investigated and prosecuted another acclaimed Chinese scientist at NOOA forcing his resignation, Chunzai Wang*.....……………………………………………………………………28

*The DOJ investigates Ms. Chen*.............................................................. …………31

*The Grand Jury indicts Ms. Chen*............................................................. ……………35

*The United States willfully and maliciously destroyed Sherry Chen's professional and personal life*...................................................................... …………………………...39

*Injuries to Sherry Chen*……………………………………………………………46

COUNT 1 (BIVENS) Malicious Prosecution--Lieberman and M. Benedict…………………48

COUNT 2 (Bivens) Equal Protection and Due Process Violation--Lieberman, Benedict, D. Lee, Desrosiers, Does …………….………………………………………………………..49

COUNT III (Bivens) Fabrication of Evidence – Due Process (Lieberman and Benedict)

COUNT IV (FTCA) Malicious Prosecution ……………………………………………51

COUNT 5 (FTCA) Abuse of Process………………………………………………………51

Prayer for Relief………………………………………………………………………………51

## INTRODUCTION

1.      Xiafen "Sherry" Chen is a decorated scientist and is a citizen of the United States. Ms. Chen, from 2007 until 2104, she served with distinction with the National Weather Service (NWS) as a hydrologist, whose flood forecast model literally saved lives during the historic flood of the Ohio and Mississippi Rivers in 2011.

2.      On a trip to China in 2012, Ms. Chen met very briefly with a former classmate of hers in China, Yong Jiao, who was the Vice-Minister for Water Resources in Beijing. Ms. Chen only agreed to meet with Mr. Jiao at the insistence of her nephew who had a family problem that he believed Mr. Jiao could help address. At the very end of the meeting, Mr. Jiao asked Ms. Chen a number of innocuous questions about her work and how the federal and local government shared costs to repair aging dams as well at the total water volume in the United States.

3.      Because Ms. Chen could not supply the answers to Mr. Jiao's questions, which she regarded as very basic, she did some very simple online research when she returned to the United States. On May 10, 2012 during her lunch hours, she accessed the National Inventory of Dams ("NID") public website, which is a website managed by the United States Army Corps of Engineers ("USACE"). The NID Website contains data that is generally available to the public, and a limited amount of data that is only available to government employees-- both federal and state—with a username and password. Prior to 2009 the entire NID Website, however, was open to the public without any restrictions. Ms. Chen soon realized that the information needed to answer Mr. Jiao's questions was not available on the public area of the NID Website, so she exited website. Later in that afternoon, she thought that the restricted portion may have information that she believed could be useful for her river modeling work. Ms. Chen did not have a personal username and password for restricted

4

portions of the NID Website. The password was stored in a binder that was available to all employees in her immediate office, a pooled password. The password and username were maintained by a fellow employee, Ray Davis. When asked by Sherry if he knew why NID required a password, Mr. Davis said he did and emailed Ms. Chen the password. He also realized that he had enough time before his shift end that day to give Ms. Chen a training of NID. During the training, they downloaded a file, "OH," which was relevant to an ongoing project of Ms. Chen was working on. Five days later, Ms. Chen accessed the NID database to exercise on her own, she downloaded the same document, "OH," for a second time. The document related entirely to Ms. Chen's work, and was completely unrelated to the information that Mr. Jiao sought.

4. Despite the innocuous nature of Ms. Chen's questions, Deborah Lee reported her to the security officer for the USACE. In her email, Ms. Lee falsely accused this "Chinese national" of seeking sensitive information that would betray U.S. national security interests with the intent of sharing this information with the Chinese government. Ms. Lee also erroneously identified Ms. Chen, who is a U.S. citizen, as a Chinese national.

5. Ms. Chen also contacted her supervisor, Trent Schade, and Deborah Lee whom she believed could help her answer Mr. Jiao's questions. At no time did Ms. Chen request restricted information from anyone and she never provided any restricted information to Mr. Jiao. Ms. Chen subsequently sent a number of emails to Mr. Jiao that provided the information that she believed he was seeking. The information in the emails was entirely public in nature and was not classified, secret or proprietary. In short, at all times, Ms. Chen provided only publicly available information to Mr. Jiao.

6. One glance at the information that Ms. Chen provided to Mr. Jiao would have shown it was not as described by Ms. Lee. Even a cursory investigation would have led to

5

Ms. Chen's immediate exoneration that she had not done anything wrong and had not violated any laws. Ms. Chen never betrayed national security interests or shared secret information, nor did she have any intent to share such information. Ms. Chen had been honored for her service to the United States and is a proud U.S. citizen.

7.      In response to Ms. Lee's false and malicious email, the Department of Commerce Office of Security opened an investigation of Ms. Chen. On June 11, 2013, two agents, Special Agent Andrew Lieberman and Special Agent Mike Benedict interviewed Ms. Chen for approximately seven hours without a lawyer present.

9.       Agents Lieberman and Benedict ignored exculpatory evidence throughout the interview, reached false conclusions without even a cursory investigation of underlying facts, and reported false results reflecting their racial and ethnic bias.

10.      On or about June 3, 2014, Lead Agent Lieberman completed a Report of Investigation ("ROI"). The false, misleading and malicious report was communicated to the FBI and federal prosecutors and contained the information that was presented directly to the grand jury caused the indictment and superseding indictment of Ms. Chen and to her arrest by the Federal Bureau of Investigation ("FBI") in October 2014.

11.      The FBI failed to conduct a separate investigation or sought to confirm the accuracy of the DOC's claims. Instead, the FBI and the United States Attorney's Office relied on the "evidence" that developed by the DOC Office of Security despite the fact that it contained false statements and misrepresentations and omitted material facts that would have exculpated Ms. Chen.

12.       On October 16, 2014, the United States filed a four-count Indictment against Ms. Chen ("Indictment"). After Ms. Chen's defense attorneys filed a motion to dismiss that noted fatal defects in the Indictment, and instead of responding, the government filed an

eight-count Superseding Indictment on January 15, 2015 ("Superseding Indictment"), in an attempt to save the prosecution. All of the counts in the Superseding Indictment were based on the false, biased and incomplete report and record created by Special Agents Lieberman and Benedict.

13.   The charges were false, malicious, and entirely fabricated. The allegations resulted directly from the actions of Defendants Lieberman and Benedict and from other law enforcement agents, "Does," who intentionally knowingly, and recklessly made false statements and representations and material omissions of facts in their reports, affidavits, and other communications with federal prosecutors, thereby initiating and allowing to continue a malicious prosecution of Sherry Chen.

14.   The prosecution of Sherry Chen was directly the result of false and misleading statements and material omissions made by Defendants Lieberman, Benedict and Does and it collapsed by its own wrongful weight. After meeting with Ms. Chen's defense counsel for one meeting, on March 10, 2015, the U.S. Attorney for the Southern District of Ohio, Carter M. Stewart dismissed all of the criminal charges against Ms. Chen, without prejudice.

15.   Indeed, throughout Ms. Chen's ordeal, beginning with her arrest, the government has sought to make an example of her and, without basis in law or fact, to destroy her unblemished reputation that had taken years for Ms. Chen to establish.

16.   Apparently in an attempt to create maximum adverse publicity about Ms. Chen, instead of allowing her to voluntarily turn herself in when was arrested, which she would have readily done, the government arrested her at work at front of her colleagues.

17.   The arrest and prosecution produced countless news stories, some of which falsely reported that Ms. Chen had been spying for the Chinese.

7

18. The government made no attempt to take responsibility for creating this false narrative, even after it dismissed the charges against her, it did not apologize for maliciously prosecuting her.

19. Further, despite the dismissal of the charges against her, Ms. Chen was terminated from her job as a hydrologist on March 10, 2016. On information and belief, Defendant Renee Desrosiers took part in the original decision to fire Ms. Chen, relying on essentially the same false charges.

20. Ms. Chen challenged the reasons for her termination, and on April 23, 2018 in a 135-page opinion highly critical of the government, Chief Administrative Judge Michele Szary Schroeder agreed with Ms. Chen that she had been a victim of a gross injustice, and ordered Ms. Chen's reinstatement.

21. Even this, however, was not sufficient for the same individuals at Commerce, "the Does," who on information and belief took part in the initial firing, the later forced leave of absence, and shared the same racist and biased thinking that shaped the Chinese American experience in America. This racist and biased thinking that shaped the decision-making involving Ms. Chen from the start continued, unmoved by the judgment of the court, pleas from civil rights organizations, respected leaders from across the community, and exculpatory evidence that exonerated Ms. Chen. On June 18, 2018, the DOC announced that it would file a petition for review and Ms. Chen would be placed on administrative leave because her presence in the workplace would be "unduly disruptive." Defendant Desrosiers was listed as the contact person for the decision to place Sherry on administrative leave because her "presence in the workplace would be "unduly disruptive." Ms. Desrosiers treated Sherry differently from non-Chinese employees who received favorable MSRB decisions.

22.     Because there is not a necessary quorum of board members to hear MSPB appeals, there are nearly 2,000 cases pending review and another 1,600 waiting for board action. Based on information and belief, Sherry Chen's case may not be heard until 2021.

## SUMMARY OF CLAIMS

23.     This is an action brought under the United States Constitution pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) against Defendants Andrew Lieberman and Mike Benedict for malicious prosecution (Count I) and fabrication of evidence regarding Sherry Chen in violation of the Fourth and (Count III) for violation of the Fifth Amendment's Equal Protection and Due Process Rights for the unequal treatment of Ms. Chen because of her national origin and race.

24.     Pursuant to Davis v. Passman, 442 U.S. 228 (1979), this is an action brought against the Defendant Renee Desrosiers, Deborah Lee, Andrew Lieberman, Mike Benedict and "Does" in violation of the Fifth Amendment's Equal Protection and Due Process rights because of their unequal treatment of Ms. Chen because of her national origin. (Count II).

25.     Pursuant to the Federal False Claims Act ("FTCA"), this is an action brought against the U.S. government for: (1) malicious prosecution under Ohio law based on the unlawful prosecution of Ms. Chen (Count IV), and in the alternative for (2) abuse of process.

26.     For her Amended Complaint under the above statutes, Ms. Chen states as follows:

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this Amended Complaint under the Fourth and Fifth Amendments to the United States Constitution and; 28 U.S.C. §§ 1331, 1346(b)(1) and to issue declaratory and injunctive relief under 28

9

U.S.C. §§ 2201 and 2202, and under its inherent equitable powers.

28.    Six months have passed since the filing of administrative claims without action. Sherry Chen has therefore exhausted all administrative remedies under the FTCA.

29.    Venue is properly within this District under 28 U.S.C. § 1402(b) as the prosecution of Sherry Chen occurred in the Southern District of Ohio and where a significant portion of the actions giving rise to this cause of action

30.    The statute of limitations ran on the last criminal count against Ms. Chen on or about June 10, 2018, so as of that date the United States has abandoned the case against Ms. Chen and became barred from seeking a new indictment against Ms. Chen. Hence, the causes of action alleged herein are ripe, and are not barred by the e two year of the statute of limitations.

## PARTIES

31.    Plaintiff Xiafen "Sherry" Chen, currently resides at the address listed in the caption.

32.    Defendant United States of America is the appropriate Defendant under the Federal Tort Claims Act.

33.    Defendant Andrew Lieberman was at all times relevant to this Amended Complaint a Special Agent employed U.S. Department of Commerce, Office of Security. He is sued in his individual capacity.

34.    Defendant Michael Benedict was at all times relevant to this Amended Complaint a Special Agent employed U.S. Department of Commerce, Office of Security. He is sued in his individual capacity.

35.    At all times relevant to this Amended Complaint, Defendants Lieberman and Benedict were acting within the course and scope of their employment with federal

10

investigative and law enforcement agencies.

36.    At all times relevant to this Amended Complaint, Defendants Lieberman and Benedict were acting as investigative or law enforcements agents.

37.    Defendant Deborah Lee was the Chief of the Water Management Division at the Army Corp of Engineers. After an innocent request for information, Ms. Lee reported their correspondence to security staff and stated that "an effort is being made to collect a comprehensive collection of U.S. Army Corps of Engineers water control manuals on behalf of a foreign interest." She directly caused the espionage investigation of Ms. Chen with that e-mail. She also testified before the grand jury, and even after the criminal investigation ended, continued to accuse Sherry of stealing secrets. Her conduct as an official and under the color of law violated the constitutional rights of Sherry Chen and injured her reputation and life.

38.    Defendant Renee Desrosiers is the Director of Workface Relations Division, Workforce Management Office at the United States Department of Commerce. Ms. Desrosiers was listed as the contact person for the decision to place Sherry on administrative leave because her "presence in the workplace would be unduly disruptive." Upon information and belief, as the Director, she took part in the decision to treat Sherry differently from others who received favorable MSRB decisions.

39.    John and Jane Does are the yet to be identified employees and agents at the FBI, Commerce and the U.S. Attorney's Office who took part in the in the unlawful investigation and prosecution of Sherry Chen, including the unlawful searches and seizures of Ms. Chen's private communications, data, and property, and the continuation of a persecution of a U.S. citizen and renowned scientist, an investigation that was opened based on a false, misleading and racist email, and that has continued unabated despite the

11

continual and continuing discovery of exculpatory facts until today in violation Sherry

Chen's life, liberty and property rights protected by the Constitution.

## FACTS

### *Sherry Chen was a decorated scientist at the NWS*

40.     Ms. Chen was born in China. After obtaining bachelor's and master's degrees

in hydrologic engineering in China, from a university deemed "the MIT of China," she

immigrated to the United States in 1992. In 1997, Ms. Chen became a naturalized U.S.

citizen.

41.     She continued her studies in the U.S. and obtained a second master's degree in

water resources and climatology from the University of Nebraska.

42.     After a dozen years working for the State of Missouri as a hydrologist, in 2007

she was hired by the National Weather Service (NWS) to serve as a hydrologist in its Ohio

River Forecast Center (ORFC) in Wilmington, Ohio. She was employed with the NWS as

a Grade 12 Hydrologist until the agency removed her from employment in March 2016.

43.     The National Oceanic and Atmospheric Administration (NOAA) is dedicated to

predicting and protecting the environment and is part of the United States Department of

Commerce. The NWS is part of NOAA. The NWS provides weather, hydrologic and

climate forecasts and warnings. Within the NWS are a number of River Forecast

Centers that provide models and forecasts on flooding, water levels, and related

weather events. Ms. Chen was assigned to the Ohio River Forecast Center (ORFC) in

Wilmington, Ohio, during her employment with the NWS.

44.     Ms. Chen was responsible for performing a wide range of assignments of

considerable difficulty and complexity in hydrology and water resources, with an emphasis

on developing river forecast models relating to the Ohio River and its tributaries. The river

model was referred to as a Hydrologic Engineering Center's River Analysis System or HEC-RAS, which simulates flow on a river with input from its tributaries. Ms. Chen's Ohio HEC-RAS covered the whole Ohio River drainage area, which extends from the western edge of Pennsylvania to the Illinois/Indiana border and from Lake Erie to Central Tennessee. To develop her HEC-RAS, Ms. Chen would gather information and data about the geometry of the river, the overbank, and the land surrounding the river. Ms. Chen would then use the information and data to run simulations along with a series of calibrations to improve the simulations.

45.     Ms. Chen was a stellar employee with the NWS. She had a spotless record — no disciplinary warnings of any kind — during her years of service. Ms. Chen's primary work was to develop and implement the Ohio River HEC-RAS model, which was the largest of its kind in the nation at the time. The goal of the computer model was to significantly improve flood prediction along the Ohio River and its tributaries. The modeling effort was a critical part of the joint mission of the OHRFC and the U.S Army Corps of Engineers. Ms. Chen worked tirelessly as a critical member of the team to the point of developing carpal tunnel syndrome in her right finger from repeated mouse clicks. She was the hydraulic modeler on the team responsible for setting up the model in great detail. Inches matter because it represents the difference between levies being breached or not. Levee failure matters because it can mean the difference between loss of property and lives. Hence, Sherry was trusted to attend to details and get the details right and she did. And everyone she worked with knew this about Ms. Chen. The efforts of Ms. Chen's hard work paid off when she and her team members were chosen for a special national award for work that saved lives and property from the Ohio River flooding. Further, Ms. Chen was no stranger to such accolades for receiving awards for her

13

previous life-saving work in Mississippi.

46.     In 2012, Ms. Chen's performance evaluation stated: "Ms. Chen continues to meet and exceed all elements of his performance plans." (sic) The appraisal added, "Ms. Chen contributes "significant proficiency in daily operations." She demonstrates thorough knowledge of the Ohio River Basin and an exceptional knowledge of the Ohio River. She knows the forecast process well… Ms. Chen shines in the procedure development here. She is the OHRPC leader in dynamic river modeling."

47.     In October 2014, in a Recommendation for Recognition, Ms. Chen's then-direct supervisor in lauded her for her "tireless" and "outstanding" work that "produced positive results of national significance…"

48.     Ms. Chen consistently received positive feedback from her supervisors about her excellent job performance during her tenure at the NWS, including an outstanding annual review received from her supervisor on October 19, 2014. Ms. Chen, who had a spotless disciplinary record, was finally being recognized nationally for her pioneering work as a hydrologist.

49.     Every years, Ms. Chen tried to see her aging mother and family. Indeed, the adage that "no good deed goes unpunished" is unfortunately all too true for Ms. Chen. During a family trip to China in April of 2012, a nephew of Ms. Chen's asked her to meet with Yong Jiao who was the Vice-Minister for Water Resources in Beijing and was a former classmate and colleague of Ms. Chen's. The nephew's desire for Ms. Chen to meet with Mr. Jiao related to a family matter with which the nephew believed Mr. Jiao could assist. Ms. Chen originally refused her nephew's request because she wanted to spend time with her family and she had not seen Mr. Jiao in several years, but after repeated requests, she agreed. Mr. Chen then met with Mr. Jiao for approximately 15-20 minutes. The vast majority of the

14

meeting concerned the nephew's issue.

50.     At the end of the meeting, the two scientists briefly chatted about their respective jobs since they were both in the same profession. Mr. Jiao asked if Ms. Chen knew how the U.S. federal and local governments shared costs in funding their dams. He also asked if she knew the total water volume for the U.S. In Ms. Chen's view these were simple and basic questions. Even though they were only casually asked as "by the way" questions, she was embarrassed not to know the answers. She told him she would track down the answers when she returned to the U.S.

51.     Upon returning from China to work on May 10, 2012, Ms. Chen tried to quickly find available public information online to answer Mr. Jiao's questions although this proved difficult. On May 10, 2012 during her lunch hours, she accessed the National Inventory of Dams ("NID") public website, which is a website managed by the United States Army Corps of Engineers ("USACE"). The NID Website contains data that is generally available to the public, and a limited amount of data that is only available to government employees--both federal and state—with a username and password. Prior to 2009 the entire NID Website, however, was open to the public without any restrictions. Ms. Chen soon realized that the information needed to answer Mr. Jiao's questions was not available on the public area of the NID Website, so she exited website. Later in that afternoon, she thought that the restricted portion may have information that she believed could be useful for her river modeling work. Ms. Chen did not have a personal username and password for restricted portions of the NID Website. The password was stored in a binder that was available to all employees in her immediate office, a pooled password. The password and username were maintained by a fellow employee, Ray Davis. When asked by Sherry if he knew why NID required a password, Mr. Davis said he did and told Ms. Chen that the

15

information and the password for NID was in the binder in the operational area. Then, Mr. Davis emailed Ms. Chen the password. He also realized that he had enough time before his shift end that day to give Ms. Chen a training of NID. During the training, they downloaded a file, "OH," which was relevant to an ongoing project of Ms. Chen was working on. Five days later, Ms. Chen accessed the restricted portion of the NID Website to practice on her own, she downloaded the same document, "OH," for a second time. The document related entirely to Ms. Chen's work, and was completely unrelated to the information that Mr. Jiao sought.

52.    On May 11, 2012, Ms. Chen sent an email to her supervisor, Trent Schade and made it clear that she was looking for public information.

53.    During that month she sent to Mr. Jiao four emails only two of which were substantive, in which she provided him information she had found online including information copied and pasted from the USACE's public website as Ms. Lee had directed.

54.    All of Ms. Chen's emails to Mr. Jiao contained only publicly available information just as Ms. Lee suggested to Ms. Chen and the main phone line number to Ms. Lee's office for further inquiries.

55.    On May 24, 2012. Ms. Chen called Deborah Lee, then the Chief of the Water Division of the U.S. Army Corps of Engineers (USACE). Ms. Lee was not a stranger to Ms. Chen as the two had periodically worked together over the years. Ms. Chen told Ms. Lee she had been to China recently on a trip to visit family and while there, a former classmate, who worked in the same field as Ms. Chen, asked her a few questions about U.S. dams that she could not answer. She shared these questions with Ms. Lee.

56.    Ms. Lee did not have specific answers, but she referred Ms. Chen to the ASACE

16

website. Ms. Chen thanked Ms. Lee for her help. The telephone call was brief and unremarkable.

57.     However, unbeknownst to Ms. Chen, immediately after the call, Ms. Lee emailed the USACE Division of Security and reported Ms. Chen as a potential security risk. In her email, Ms. Lee reported their conversation as follows: She "[Ms. Chen] is a citizen but a Chinese national." Of course, this statement is incorrect and demonstrates Ms. Lee's bias. Ms. Chen is a United States citizen. She is not a "Chinese national;" she is a naturalized American citizen. Ms. Lee reported that Ms. Chen on a recent trip to China "was approached by Chinese colleagues, she was asked to collect information on how US Federal reservoirs are authorized, designed, and built." Ms. Lee was wrong again. Ms. Chen was not "approached by Chinese colleagues," but had met only Mr. Jiao for approximately 15 minutes at her nephew's request, and Mr. Jiao did not request the information listed in Ms. Lee's email. Ms. Lee declared that Ms. Chen was inquiring about water control manuals which, Ms. Lee claimed, "are not publicly available." Yet again Ms. Lee is wrong. In fact, Ms. Chen had recalled, correctly, that at least some water control manuals are indeed publicly available. For example, the state of Missouri, where Ms. Chen had previously worked, makes its Water Control Manuals available on-line. In short, Ms. Chen's nightmare that continues to this day, began with a single ill-informed, factually incorrect, misleading and racist email by a fellow scientist she viewed as a colleague.

58.     On information and belief, Ms. Lee made the false and misleading claims in her email based on racial and ethnic animus. Ms. Chen made clear to Ms. Lee that she was looking for publicly available information. Also Ms. Chen expressly told Ms. Lee that she was looking for information for a colleague in China, a fact that presumably an alleged spy for the Chinese government would not have disclosed.

60.     Upon information and belief, Ms. Lee repeated her false, misleading and racially

biased statements before the grand jury which indicted Sherry Chen.

61.     Ms. Lee did not stop making racist comments against Ms. Chen even after the

government dismissed all of the charges. Ms. Lee wrote a letter on March 12, one day

after the charges against Ms. Chen were dismissed, to Carter M. Stewart, United States

Attorney of the Southern District of Ohio in which she complained bitterly about the

dismissal of the charges and attempted to justify her reporting of Ms. Chen to the DOC's

Office of Security. (A copy of the letter is attached hereto as Exhibit)-. In the letter, Ms.

Lee made numerous false and misleading statements:

> "She stated she was asking for information on behalf of a Chinese colleague
> whom she would not name, although I repeatedly asked. I asked her to refer him
> to me, which despite repeated statements in the press that she did so, she did not."

> She asked for a breadth and depth of information not required to perform her
> work duties. She specifically requested all of the water control manuals for all
> dams of the United States in electronic form, requested all of the water control
> manuals for all dams, and how to access the National Inventory of Dams (NID).
> She also requested information on the U.S. Army Corps of Engineers planning
> process."

> "When I refused to provide with non-public information (the water control
> manuals are restricted as well as portions of the NID), she became angry and
> demanding..... Her change in personality was the final deciding factor."

All of the above statements are false or inaccurate. All of the information that Ms. Chen

sought on behalf of Mr. Jiao was publicly available, and Ms. Chen never had a single

conversation with Ms. Lee about this matter. Ms. Chen did refer Mr. Jiao to the Army Corp

of Engineers as Ms. Lee requested.  Ms. Chen didn't refuse to give Jiao's name as Ms. Lee

never asked.  Ms. Chen didn't ask Ms. Lee how to access NID as Ms. Chen already knew

how to access because she had got a training from Mr. Davis on May 10, 2012 and Ms. Chen

had practiced on her own on May 15, 2012, a week before Ms. Chen called Ms. Lee on May

24, 2012. Ms. Chen never refused to give Mr. Jiao's name as Ms. Lee never asked. In fact,

18

Ms. Chen did refer Mr. Jiao to the Army Corps, as Ms. Lee requested and where Ms. Lee worked..

62. Ms. Lee wrote in filing in an "operations security report that she "also considered the risk to myself and my family's well-being. Because my husband makes frequent business trips to China and is employed by a North American enterprise wholly owned by a consortium of Chinese investors, I knew I was exposing my family at a minimum to economic risk should retaliation result in a loss of his employment." These are simply specious and racist allegations. Even the government has never suggested that Ms. Chen somehow represented a threat to the community, and Ms. Lee suggestion that she may have herself and her family in physical danger ("I knew I was exposing my family at a minimum to economic risk") could only have been motivated by her ethnic bias.

63. Notwithstanding that Ms. Lee's e-mail was false, misleading, and racist – and despite Ms. Chen's stellar record – Ms. Lee's May 24, 2012 email directly resulted in the Department of Commerce Office of Security opening a full field and counterintelligence investigation of Ms. Chen.

64. Defendant Andrew Lieberman, who was the lead agent on Ms. Chen's case was also the lead agent in extensive espionage and counterintelligence investigation of another Chinese scientist, Chunzai Wang, who was a top expert in Climate Change, at the same agency as Ms. Chen. Both Dr. Wang and Ms. Chen ultimately would be prosecuted on unrelated and lesser charges than espionage. On information and belief, these espionage investigations intentionally targeted Chinese scientists based on their race and ethnicity.

65. D. Lee's racist and biased view of Ms. Chen and her unfounded suspicions of her loyalty to the U.S. are not confined to her or is a unique understanding among employees at the Department of Commerce. In fact, this view has resulted in Ms. Chen not being

19

permitted to return to work at the National Weather Service. Ms. Chen has been fully cleared of all the criminal charges against her, yet the government has not permitted her to practice her profession and to assist the government in protecting the Ohio valley region from flooding.

66.    Her placement on administrative leave continues due to the unproven, false and racially driven accusation that she is "disruptive." There is no evidence that Ms. Chen has ever been disruptive in the workplace. There is no hearing, no due process, and no end to this temporary administrative leave, a de facto firing circumventing the administrative court ruling that in accordance with due process, ordered Ms. Chen's return.

*The United States prosecuted other Chinese Scientist based on their race and ethnicity.*

67.    Ms. Chen is one of three espionage-related prosecutions of Chinese American scientists in a ten-month period in which government dismissed the charge before trial, including: (1) Professor Xiaoxing Xi, then Chair of Temples Physics Department, and (2) Guoqing Can and (3) Shuyu Li, senior biologists at Eli Lilly & Company. On information and belief, the United States view Chinese-Americans as uniquely suspicious based on their race and ethnicity. [Attach as Exhibits articles on these cases] After the public outcry over these case, the DOJ conceded there was a problem. On June 27, 2016, then- Deputy Attorney General Sally Q. Yates "sent a memo to all law enforcement agents and prosecutors informing them of the new Implicit Bias Training Program and its importance to a strong and fair criminal justice system." There was no similar response in Commerce to what the Attorney General recognized was a problem of racial targeting Chinese scientists. Instead, Ms. Chen was fired and placed on administrative leave because her presence would be unduly disruptive.

*68.*      The treatment of Ms. Chen and other Chinese-American scientists continues to lead to worldwide outcries. Defendant Lieberman and Benedict lead an investigation into Ms. Chen's use of the pooled password kept in a common folder for use by all employees, selectively prosecuting only Ms. Chen for the use of the password, not interviewing other users of the password, and ignoring exculpatory evidence.

69.      The National Inventory of Dams Website (NID), which is a Website managed by the United States Army Corp of Engineers ("USACE"). The NID Website consisted of both public and partially restricted areas. The public section of the NID Website was entirely open to public, i.e., anyone with internet access could access this portion. In 2012, the NID Website contained a total of 70 fields of data. Of these, 64 fields were available to virtually anyone who requested a username and password, regardless of whether the requestor is a government employee or has an "official" need for the information. Any schoolchild, anywhere in the world, could request –and would be granted – a username and password without any background check required. Thousands of passwords have been granted. The remaining six fields of data, which were not available to the public, are for the following: i) downstream hazard potential; ii) nearest city; iii) distance to nearest city; iv) condition assessment; v) condition assessment detail; and vi) condition assessment date. Of these six fields, the first three – downstream hazard potential, nearest community and community distance – are available on other public websites. The three remaining fields – condition assessment, condition assessment detail, and condition assessment date – are not only non-sensitive, they are largely non-existent: the NID contained no information whatsoever for over 75%of these remaining fields – the data fields are entirely blank. Prior to 2009, the NID did not even require login credentials.

70.      In 2009, the USACE held a webinar for NWS employees to encourage them to

use the Website, and instituted a new policy that the NID required password to access certain databases.

71.     In Ms. Chen's office, from 2009, Ray Davis was the keeper of the password for the office. Ray Davis was Ms. Chen's co-worker and a hydrologist. Davis has training in geographic information systems, which allowed him to obtain and process map data that would be useful to Ms. Chen with the development of her Ohio River HEC-RAS. Mr. Davis was also the focal point at the OHRC for emergencies involving dam breaks. Mr. Davis had a username and password for the restricted databases within the NID website. Mr. Davis maintained the username and password for the NID in a "Dam Break" binder in the operations area of the office so it was available to all employees in case of an emergency when Mr. Davis (as dam break focal point) was not available. Mr. Davis maintained a current NID username and password for employees to access the NID starting in 2009 and the practice continued until approximately October 2014.

72.     Not surprisingly, Mr. Davis shared that password with Ms. Chen. Hence, he was first interviewed by Defendants Lieberman and Benedict. Mr. Davis did not remember emailing the username and password for the NID database to Ms. Chen. Defendants Lieberman and Benedict refreshed his recollection by showing him the email he had sent 13 months ago.  Then, he recalled.  Mr. Davis also informed Defendants Lieberman and Benedict that he shared the NID password with others in the office; however, despite Agent Lieberman's testimony that "we left no stone unturned" Defendants Lieberman and Benedict did not talk to any other of  employees Mr. Davis mentioned regarding the availability and use of a password, which was actually kept in a common folder in the office and shared with others. Unlike Ms. Chen, the government did not seek to prosecute Mr. Davis for a false statement under 18 U.S.C. § 1001 for forgetting that he emailed Ms.

Chen the information. Defendants Lieberman and Benedict believed Mr. Davis "honestly forgot." The same understanding, of course, was not extended to Ms. Chen. Nor was their investigation of who else might have been using the pooled password accessible to all.

73.     The focus was on Ms. Chen. During this interview, Mr. Davis told Defendant Lieberman numerous times that Ms. Chen has work-related reasons — generally and specifically — to use the NID database. For example, Mr. Davis said the information would be useful and helpful to Ms. Chen. According to Mr. Davis, Ms. Chen had a need to get data and using the NID would make it easier. Mr. Davis also discussed "hydro pool capacity" information with Defendants Lieberman and Benedict, although Defendant Lieberman did not understand what that meant and apparently did not follow-up with Mr. Davis to gain an understanding. Mr. Davis also responded negatively when asked if accessing the NID would be outside the scope of Ms. Chen's work as a hydrologist.

74.     On June 11, 2013, lead agents Andrew Lieberman and Defendant Benedict arrived at the Wilmington office- without notice- and behind closed doors, grilled Ms. Chen for approximately seven hours. Ms. Chen answered all their questions without the benefit of counsel. At the end of the interview, she provided a 5-page handwritten statement, which was entirely truthful and accurate. Defendant Lieberman asked the questions while Defendant Benedict took hand-written notes. Defendants did not provide Ms. Chen with the opportunity to consult her calendar or emails, much less an attorney. The Defendants never told her why they were there, what the investigation concerned, or even that she was the focus of it. This was a critical omission, because Ms. Chen had no idea or reason to know what was important to the investigation – which dates, which emails, which interactions – and which were peripheral. Had Ms. Chen known that it was critical to know the date she last traveled to China, it would have been a simple matter to look up. Instead, out of a

23

misguided attempt to be helpful, Ms. Chen said that the last time she had visited China was the previous year, in May, 2011, when, in actuality, she had last visited China in May, 2012. That type of nonmaterial error – of forgetting a date, a name, or the precise sequence of events – is to be expected in any lengthy interview, particularly when the interviewee has no idea what the investigation is about and, therefore, what information is likely to be material or crucial.

75. The interview was extraordinarily lengthy. Ms. Chen came to work at 7:00 a.m. on June 11, 2013. She had not had breakfast that morning. At 11:05 a.m., the Defendants Lieberman and Benedict began their interrogation of Ms. Chen. At no time did they offer her food, water or an opportunity to take a break. She was not offered an opportunity to use a bathroom for more than five and one-half hours. Defendants Lieberman and Benedict advised her, in response to her question, that she did not need an attorney. They proceeded to question her for more seven hours, until 6:00 p.m., without respite, about events that had occurred more than one year prior and about which Ms. Chen had had no reason ever to think about or consider since that time. Defendant Benedict prepared a typed Memorandum of Interview within one or two weeks of the interview, but it was not signed by Defendant Benedict until November 6, 2013. It is not clear when Defendant Lieberman actually reviewed the notes. During the marathon interview, Ms. Chen patiently explained the background of her May 24, 2012 telephone call to Ms. Lee and her trip to China that had preceded it. She explained she had traveled to Beijing China to visit her elderly parents of her brief meeting with a former classmate who held a position with the Chinese government in the area of water resources. She explained this meeting was a favor to Ms. Chen's nephew whose father in law had a longstanding dispute with the local water bureau over a water pipeline project.

76.     She also described how upon her return to the U.S. she had tried to find public information online to answer Mr. Jiao's questions, but was unable to do so. She also told Defendants Lieberman and Benedict that on May 11, 2012, she sent an email to her supervisor, Trent Schade, and subsequently called Ms. Lee on May 24, 2012. At all times she made clear she was looking for public information.

77.     She further told Defendants Lieberman and Benedict that she had sent Mr. Jiao emails, only two of which were substantive, in which she provided him information she had found online, including information copied-and-pasted from the USACE's public website as Ms. Lee had directed. At the end of the June 11, 2013 interview, Ms. Chen provided to Defendants Lieberman and Benedict copies of every one of these emails.

78.     Thus, as of June 11, 2013, the Defendants knew that Ms. Chen had sought and provided to Mr. Jiao only publicly available information. She had done exactly what Ms. Lee asked her to do and to refer Ms. Jiao to the Army Corps of Engineers.

79.     In other words, it was clear to the Office of Security agents that Ms. Chen had not shared any secret or otherwise confidential information with Ms. Jiao or for that matter, anyone outside of the agency.

80.     Nonetheless, on or about October 16, 2014, Ms. Chen was indicted for multiple violations of federal law including "unauthorized access" of a government data base and steal[ing] computerized fields of data.

*Defendants Lieberman and Benedict draft a maliciously false ROI causing Ms. Chen's Indictment and arrest.*

81.     Defendants Lieberman and Benedict were particularly ill-equipped to interview Ms. Chen. Defendant Lieberman had no experience as a hydrologist. He did not have any expertise regarding data in relation to water movement or locks and dams. In fact, going into the interview, Defendant Lieberman did not even know that Ms. Chen's position

required her to acquire information about locks and dams. Prior to the interview, the Defendants Lieberman and Benedict did not make any inquiries about the type of information Ms. Chen was asking for on behalf of Mr. Jiao, e.g., whether it was public information. In fact, Defendants Lieberman and Benedict confirmed shortly after Ms. Chen's interview that the information Ms. Chen was seeking for Mr. Jiao was public information and they found no evidence that Ms. Chen had ever provided secret, classified, or proprietary information to a Chinese official or anyone outside of the agency.

82.     Defendants Lieberman and Benedict believed, based in large part on Ms. Lee's email, that Ms. Chen was providing restricted information to Chinese nationals. They were sent to investigate counter-intelligence.

83.     Upon information and belief, Defendants Lieberman and Benedict had never conducted such investigation and had never received training as to how to do so, including as how to conduct an interview of witnesses in such an investigation. Accordingly, Defendants Lieberman and Benedict were not competent to be involved in such an investigation.

84.     But even a cursory review of Ms. Chen's e-mails would have shown that she was not providing secret information to anyone. A walk around the office would have shown the password folder. An examination of the downloaded files would have shown Ms. Chen's innocence. On the basis of their evidence, the investigation should have ended immediately after the June 11, 2013 interview with Mr. Davis and Ms. Chen. But Lieberman and Benedict forged ahead.

85.     On or about June 3, 2014, Lead Agent Lieberman completed the ROI. The Defendants Lieberman and Benedict in an objectively unreasonable fashion (2) stated a deliberate falsehood or showed reckless disregard of the truth and (2) that the allegedly

26

false or omitted information was material in the finding of probable cause.

86.    Agent Lieberman knew the ROI would be shared with the United States Federal Bureau of Investigation (FBI) and with federal prosecutors.

87.    Agent Lieberman recklessly made or caused to be made false statements and representations and material omission of facts in the ROI, and in other communications with federal prosecutors, and the FBI, thereby initiating a malicious prosecution of Sherry Chen, as evidenced by false allegations made in the Indictment and Superseding Indictment.

88.     The false statements and material omissions regarding Ms. Chen's conduct in 2012 included but were not limited to the accusation that Ms. Chen improperly accessing the USACE's National Inventory of Dams (NID) database and downloading files from it for the purpose of sharing secret information about U.S. dams with the Chinese government. This allegation was completely false:

89.    Defendants Lieberman and Benedict knew or should have known from their interview that Ms. Chen had, in fact, properly accessed the NID database in May 2012 for job- related reasons; Defendants Lieberman and Benedict specifically knew that Ms. Chen had accessed the NID database on May 10, 2012, with the assistance of her co-worker, Ray Davis.

90.    Defendants Lieberman and Benedict knew or should have known Ms. Chen had not improperly used acquired information belonging to the federal government and had not made any material misstatements when they interviewed her on June 11, 2013.

91.    The Defendants chose not to investigate or reveal this key evidence that would have exculpated Ms. Chen.

92.    The Defendants did not disclose that the e-mails that Ms. Chen shared with

27

Defendants Lieberman and Bennett would have established she did exactly as requested of her by Ms. Lee and referred the public files and offered a main phone line number to the Army Corp of Engineers for further inquiries as Lee suggested.

93.     Defendant Lieberman falsely alleged the key file, "OH ," downloaded twice (May 10, 2012 and May 15, 2012) from the NID without permission.

94.     Defendant Lieberman and Benedict failed to pose clear questions to Ms. Chen and to follow-up on Ms. Chen's responses to determine if and when Ms. Chen was looking at the public portion of the NID versus the password-protected portion. Defendant Lieberman and Benedict falsely alleged Ms. Chen had accessed the NID database inappropriately with someone else's password at the noon access by Ms. Chen did not involve the use of credentials and the information was public record. The other access to the files was with permission and Mr. Davis in an effort to train Ms. Chen.

95.     All of the evidence uncovered by Defendants Lieberman and Benedict established that Ms. Chen could use the password e-mailed to her by Mr. Davis and access the files for the state of Ohio where she built models to prevent flooding. Ms. Chen was authorized to download the files that she did and there is no evidence that Ms. Chen used the access to convey secret information or to even answer the questions Mr. Jiao asked. To the contrary, Ms. Chen's own e-mails directed Mr. Jiao to the Army Corp of Engineers, to public records and to the main phone line of the Army Corp of Engineers as Ms. Lee suggested.

96.     Hence, the Defendants Lieberman and Benedict and the United States knew or should have known there was no evidence that Ms. Chen had entered into a restricted the NID database without authorization. They knew or should have known that the downloaded files did not have sensitive information. They knew or should have known Ms. Chen's few e-mails to an old Chinese schoolmate in the same scientific field showed

the innocent nature of the correspondence, since Ms. Chen only provided public information, and that Ms. Chen had been transparent in her requests for information from her co-workers. What the Defendants presented to the F.B.I, which was then in turn presented to the grand jury, as proof of downloaded secrets of America's dams was actually a file that was not downloaded surreptitiously but was downloaded with the knowledge and consent of Mr. Davis. In order to overcome his exculpatory evidence, Defendants Lieberman and Benedict fabricated evidence.

97.     The actions of Defendants Lieberman and Benedict in intentionally, knowingly and/or recklessly providing false information to federal prosecutors and in misrepresenting evidence of a clearly exculpatory nature, were done with the intent and purpose of initiating a malicious prosecution of Sherry Chen, and these communications led directly to the false indictment and prosecution.

*On information and belief, Defendants Lieberman also selectively investigated and prosecuted another acclaimed Chinese scientist at NOOA forcing his resignation, Chunzai Wang.*

98.     In addition, Ms. Chen is not the only Chinese-American to have been targeted by the DOC and Agent Andrew Lieberman based on their ethnicity: Chunzai Wang is one of the world's foremost experts on climate change and hurricanes. A naturalized U.S. citizen, he was a successful climate scientist at NOAA Atlantic Oceanographic and Meteorological Laboratory, and was named the NOAA Employee of the Year in 2012.

99.     In 2016, Defendant Andrew Lieberman executed a search warrant at Dr. Wang's home and office, and, just like in Ms. Chen's case, interrogated Dr. Wang for an entire day, without counsel and without a food or water break. As a result of the search warrant, the interrogation, and the negative publicity, Dr. Wang felt compelled to resign from NOAA, a position that he loved and where he worked tirelessly for 17 years. With no

29

other work alternative available at the time, Dr. Wang left his family in Miami and found work at the Chinese Academy of Sciences in China doing similar research regarding climate change.

100.    In September of 2017, when Mr. Wang returned to the U.S. to visit his family, the government arrested Dr. Wang at the airport. The government alleged that Dr. Wang committed time and attendance fraud when he spoke at scientific conferences in China without first notifying his supervisor, and that he illegally supplemented his income—Dr. Wang was a Guest Professor at the Ocean University of China and, while he was on annual leave, was paid a small fee per diem for mentoring students and helping them with their research.

101.    On the brink of trial, the government offered Dr. Wang a deal: a plea to a single count of supplementation of income from Changjiang Scholars Program, with a sentence of "time served" (he spent one night in custody when he was arrested); no probation, no fine, no restitution; and, most significantly, no crushingly expensive three-week long trial which he could only have afforded by borrowing from his elderly parents and other family in China. The plea meant that Dr. Wang could protect his family from the debilitating stress and immediately return to China and resume his research.

102.    The presiding judge, Cecilia Altonaga, made clear her displeasure with this prosecution. After hearing the facts of the government's case, the judge stated that her "only regret . . . is that I have to adjudicate [Dr.] Wang." The judge went on to observe that while she knew "the Government has dismissed a number of counts in the indictment in exchange for the plea to Count 6, [ ] given the nature of [Dr.] Wang's contributions to an area that is at the forefront of our daily review of news, climate change, given the nature of the research he conducts and – and the information he supplies and how valuable it is to all

of us, certainly he made mistakes here, but it's regrettable that it could not have been taken care of, I think, by some type of pretrial diversion so that he would not be an adjudicated a felon."

103.    Despite the court's admonishment the case against Dr. Wang should never have been brought in the first place; the government – after previously representing that it would not issue any press release regarding Dr. Wang's disposition – nevertheless issued a false and misleading press release "touting" their conviction of Dr. Wang. This press release violated DOJ policy by referencing unproven allegations that the Court dismissed as if they were established facts.

104.    Had the government wanted to inform the public of the unproven allegations contained in the Indictment, it was required to state that the charges were merely accusations, and that Dr. Wang was, and remains, presumed innocent of those dismissed charges. Once again, Mr. Lieberman led the investigation.

*The DOJ investigates Ms. Chen*

105.    At some point after Defendants Lieberman and Benedict interview of Ms. Chen, the Department of Commerce referred the matter to the Department of Justice for possible criminal investigation and prosecution.

106.    On June 6, 2014, an FBI Special Agent filed an application for a search warrant with the United States District Court for the Southern District of Ohio that was signed by Magistrate Judge Sharon L. Ovington on June 12, 2014. The search warrant, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), sought to require Yahoo to provide information relating to Ms. Chen's Yahoo account including her emails. The Special Agent signed the affidavit in support of the application, and he asserted that he had been involved in investigations relating to criminal violation of

31

computer and computer-based crimes and had received extensive training in this area as well.

107.    The application included false, misleading and unsupported claims, which can directly traced back to Ms. Lee's email and to the false and misleading statements in the ROI which were not independently verified by special agent Proudfoot or apparently any other FBI Special Agent. These false and misleading statements and unsupported claims include:

¶ 5: An "USACE employee," apparently "became concerned because 1) the request [to her by Ms. Chen] was clearly outside the scope of CHEN's official duties, and 2) CHEN made the request in response to a prior request purportedly made by "Chinese colleagues." This is based on Ms. Lee's factually incorrect, misleading and racially biased email.

¶ 7: "On approximately May 10, 2012, the coworker sent an email to CHEN containing his NID credentials and password via official NOAA email. CHEN never had any authorization from USACE or her NOAA supervisor to access the NID." This statement is false and particularly misleading since Mr. Davis provided Ms. Chen with the username and password to the NID based on his understanding her that Ms. Chen had work-related reasons — generally and specifically — to use the NID database, and was authorized to do so. *See* ¶ 53.

¶ 12: "Forensic analysis has revealed that on approximately May 10, 2012 at 237 p.m., CHEN's official NOAA computer and login credential were used to download the file "OH.mdb" from the website http://geo.usace.army.mil. On May 15, 2012 at approximately 7:41 a.m., CHEN's official NOAA computer and login credentials were used to download the file "OH.mdb" from the website http://geo.usace.army.mil. These files were stored on the NID restricted and sensitive database." This statement is again false by omission. It does not provide that the two files Agent Proudfoot identified in this paragraph were identical and legitimately related to Ms. Chen's work.

¶ 13: "USACE records revealed that CHEN was never an authorized NID user and did not have an active NID account. CHEN never obtained proper authorization from her NOAA supervisor to access the NID." Mr. Davis provided Ms. Chen with the username and password for the NID database. *See* ¶ 53.

¶ 14: "On May 15, 2012 at approximately 8:00 p.m., CHEN used her personal email account 'XIAFENMAIL@YAHOO.COM' to thereafter send an

email to JIAO which included an overview of the information contained in the NID. In said email, CHEN states that the "database is only for government users and non- government users are not able to directly download any data from this site." This statement is particularly misleading because it suggests Ms. Chen had provided restricted information to Mr. Jiao whereas, in fact, Ms. Chen had simply informed Mr. Jiao of the type of information contained in the NID database and provided him with public sources of information "that might to you [sic.]"

¶15. "On May 29, 2012 at approximately 8:44 a.m., CHEN sent an email from her account 'XIAFENMAIL@YAHOO.COM' to JIAO indicating that she had spoken to the chief of the USACE Water Management Division. CHEN provided a summary of information to JIAO regarding the dams that USACE maintains; hydropower capacity; dam requirements; a link to USACE's mission page; and information on the future revision of policy and procedures for building new infrastructure." This statement is also particularly misleading. It suggests, especially in the context of other statements in the affidavit, that Ms. Chen had provided Mr. Jiao with sensitive information from the NID database whereas, all of the information that Ms. Chen had provided to Mr. Jiao was information from public sources and did not include any information from the NID.

108.    In short, the affidavit does not establish probable cause, and had the Special Agent provided Magistrate Judge Sharon L. Ovington with a complete, accurate and truthful statement, she would not have signed the application for the search warrant.

109.    Moreover, from the Special Agent's affidavit statement, it is clear that he relied totally or nearly completely on the incomplete, biased, false, investigation conducted by Defendants Lieberman and Benedict and the fabrication of a story of espionage out of an innocent and open set of inquiries and with complete transparency as she made her inquiries and worked alongside the colleague who gave her the password. Had the Special Agent conducted an independent investigation, he would have discovered that Ms. Chen: (1) did not "knowingly, intentionally and without proper authority ... steal, purloin and convert to her use or the use of another, certain sensitive, restricted and proprietary computerized fields of data involving critical national infrastructure contained in the National Inventory of Dams database" (2) did not "intentionally exceed[] authorized

access to a protected United States Government computer database," and (3) did not make any material false representation during her interview by Defendants Lieberman and Benedict. In short, had the Special Agent conducted a proper investigation he would have discovered that there was no probable cause for the government to seek the indictment of Ms. Chen.

110.    Upon information and belief, the F.B.I. never conducted an investigation into whether the record and ROI created by Defendants Lieberman and Benedict was complete, truthful and unbiased or thorough or whether it contained false and misleading statements, and intentionally or recklessly omitted material facts that would show that Ms. Chen had not violated federal criminal law. Had such an investigation been conducted as it should have been, the United States would have determined, if they did not already know, that the record created by Defendants Lieberman and Benedict was misleading, inaccurate, false, and biased, in short a fabrication of evidence. Had the FBI conducted a proper investigation the United States Attorney's Office for the Southern District of Ohio would have determined, if it did not already know, that there was no probable cause it to seek the indictment of Ms. Chen.

111.    The DOJ opened the investigation of Ms. Chen because it believed—wrongly, as it turned out—that Ms. Chen was providing restricted information to Chinese nationals. As a result of these suspicions, the FBI obtained a search warrant to seize all of Ms. Chen's personal emails for the past seven years; searched Ms. Chen's work computer; searched Ms. Chen and her husband when they departed to China to visit Ms. Chen's elderly parents; reviewed years of Ms. Chen's bank and financial records; and subjected Ms. Chen to a seven-hour-long interrogation, without the benefit of counsel and no advance warning about events that occurred more than one year prior. All of these efforts did not turn up a

34

scintilla of evidence that Ms. Chen ever provided any restricted information to anyone, let alone a Chinese national.

*The Grand Jury indicts Ms. Chen*

112.    On October 16, 2014, a grand jury returned an indictment against Ms. Chen alleging violations of 18 U.S.C. §§ 641, 1001, and 1030(a)(2). The four counts related to Ms. Chen's accessing the NID database and to allegedly making false statements during her interview by Defendants Lieberman and Benedict, despite not charging Ray Davis for making similar "false" statements.. The allegations of criminal wrongdoing in the Indictment was flatly false and constituted malicious prosecution.

113.    The FBI arrested Ms. Chen at her office on October 20, 2014. As a condition of her release she "forfeited" her passport to the Court.

114.    On December 29, 2014, Ms. Chen filed a motion to dismiss Count 1 (18 U.S.C. § 641) and Count 2 (18 U.S.C. 1030(a)(2) on the grounds that those counts failed to identify what "restricted and proprietary computerized fields of data" that Ms. Chen allegedly accessed and stole from the NID database. The motion also sought to dismiss the two false statement counts (18 U.S.C. 1001) on the ground that the government had failed to allege the statements to the government were material as required by that statute.

115.    Instead of responding to Ms. Chen's motion to dismiss, on January 15, 2015, the government filed an eight-count Superseding Indictment against Ms. Chen also alleging violations of 18 U.S.C. §§ 641, 1001, and 1030(a)(2). (A copy of the Superseding Indictment is attached herewith as Exhibit C). The allegations of criminal wrongdoing in the Superseding Indictment were flatly false.

116.    The counts generally alleged as follows:

**Count 1** [18 U.S.C. § 641] - Ms. Chen did, between on or about May 10, 2012

35

and May 24, 2012, "knowingly, intentionally and without proper authority did steal, purloin and convert to her use or the use of another, certain sensitive, restricted and proprietary computerized fields of data involving critical national infrastructure contained in" the NID;

**Count 2** [18 U.S.C. § 1030(a)(2)] – On or about May 10, 2012, Ms. Chen "inten- tionally exceeded authorized access to" the NID computer database, "and thereby obtained information from a department and agency of the United States, to wit: sensitive, restricted., and proprietary fields of data concerning critical national dam infrastructures, ...,";

**Count 3** [18 U.S.C. § 1030(a)(2) – On or about May 15, 2012, Ms. Chen "intentionally exceeded authorized access to" the NID database, "and thereby obtained information from a department and agency of the United States, to wit: sensitive, restricted, and proprietary fields of data concerning critical national dam infrastructures, .... ";

**Count 4** [18 U.S.C. § 1001(a)(2)] – On or about June l1 2013, Ms. CHEN, "did knowingly and willfully make a material false representation, to wit.: that. She never, without proper authority, logged onto the restricted area of the" NID database "order to access sensitive, restricted and proprietary fields of data concerning critical national dam infrastructures. This statement was false because" Ms. Chen "knew she had previously logged onto said restricted database without proper authority on various prior dates .... "

**Count 5** [18 U.S.C. § 1001(a)(2)] – On or about June 11, 2013, Ms. Chen "did knowingly and willfully make a materially false representation, to wit: that she never, without proper authority, downloaded sensitive, restricted and proprietary fields of data concerning critical national dam infrastructures from the restricted area of the" NID database. "This statement was false because" Ms. Chen "knew she had previously downloaded data from said restricted database without proper authority on .... "

**Count 6** [18 U.S.C. § 1001(a)(2)] – On or about June 11,2013, Ms. Chen "did knowingly and willfully make a materially false representation, to wit: that she never obtained a co-worker's (identified to the Grand Jury as "R.D.") personal password assigned to access sensitive, restricted and proprietary fields of data concerning critical national dam infrastructures contained in a restricted area of the" NID database. "This statement was false because, ... [Ms. Chen] .... knew she

had without proper authority on or about May 10, 2012 received an email from "R.D." which contained his personal username and password to access said restricted database."

**Count 7** [18 U.S.C. § 1001(a)(2)] – On or about June 11, 2013, Ms. Chen did knowingly and willfully make a materially false representation, to wit: that she never used a co-worker's (identified to the Grand Jury as "R.D.") personal password to access sensitive, restricted and proprietary fields of data concerning critical national dam infrastructures contained in a restricted area of the" NID. This statement was false because the [Ms. Chen] ... she had on or about May 10, 2012 and on or about May I 5, 2012 without proper authority used "R.D.'s" personal username and password to access said restricted database."

**Count 8** [18 U.S.C. § 1001(a)(2)] – On or about June 11, 2013, Ms. Chen "did knowingly and willfully make a materially false representation, to wit: the last occasion she was approached by an individual identified to the Grand Jury as "J.Y.," the purported Vice Minister of the People's Republic of China Water Institute was in 2011. This statement was false because the [Ms. Chen] ... knew she had personally met and held discussions with "J.Y," in his official government office in Beijing, China during a visit to that country occurring between on or about April 14 and May 8, 2012."

117.    All of the Counts in the Superseding Indictment were based on the false, biased, misleading and incomplete ROI and record created by Defendants Lieberman and Benedict and by the failure of the FBI to conduct an independent investigation and to determine the accuracy and veracity of the ROI and record created by Defendants Lieberman and Benedict.

118.    On January 22, 2015, Ms. Chen filed a motion to dismiss Counts 1, 2, and 3 of the superseding indictment on the grounds that those counts still failed "to identify in any fashion whatsoever what 'sensitive, restricted and proprietary computer fields of data' Ms. Chen allegedly accessed and stole from the NID database."

119.    Only after the government had filed the Superseding Indictment, did attorneys for the United States Attorney's Office for the Southern District of Ohio and the FBI t

discover that Defendants Lieberman and Benedict had had hidden from Ms. Chen, and failed to produce to her, as required, critical information that would have established once and for all that Ms. Chen had indisputably not committed a single of the crimes alleged in the Superseding Indictment. In particular, during a visit to Ms. Chen's place of work, the AUSAs and the FBI Special Agent discovered that Defendants Lieberman and Benedict had failed to produce to them, among other things: (1) a copy of the MOI with Ray Davis that established that Mr. Davis told Defendant Lieberman numerous times that Ms. Chen has work-related reasons to use the NID database, that he had provided the username and password for the NID database to Ms. Chen, and that that username and password were kept in a binder that was accessible to all employees of the ORFC but Defendant Lieberman never looked at it; and (2) a copy of the binder itself. There is no question that the government was required to have produced this information to Ms. Chen as part of its discovery obligations under federal law.

120.    After counsel for Ms. Chen learned of the improperly withheld evidence that would have exonerated Ms. Chen, the government did not file an opposition to the motion to defense, but instead nearly five months after her arrest and only one week before her trial was scheduled to begin, the U.S. Attorney for the Southern District of Ohio announced, on or about March 10, 2015, that the government was voluntarily dismissing all of the charges against her. The U.S. Attorney offered no explanation or apology.

121.    Because the United States dismissed the Superseding Indictment without prejudice, the government retained the right to refile the counts against Ms. Chen pursuant to the limitations set forth in the statute of limitations. Pursuant to 18 U.S.C. § 3282 "no person shall be prosecuted, tried, or punished for any offense ... unless the indictment is

found ... within five years next after such offense shall have been committed." The date of the last offense allegedly committed by Sherry Chen are the five counts under 18 U.S.C. § 1001 for making false statements in connection with her interview by Special Agents of the Office of Investigations of the Department of Justice that took place on June 11, 2013. This means that the U.S. had until on or about June 10, 2018, to again charge Ms. Chen. In other words, the dismissal of all the counts against Ms. Chen was not "final" until that date.

122.    On March 16, 2015, the Court granted the Clerk's request to return Ms. Chen's passport that had been "forfeited to this Court."

*The United States willfully and maliciously destroyed Sherry Chen's professional and personal life*

123.    On October 20, 2014, four days after Ms. Chen was indicted, Ms. Chen reported to work, thinking it was like any other day. Upon entering the building shortly before noon, she noticed that a number of employees were loitering and quietly chatting in the hallways, which seemed unusual. Shortly after greeting her co-workers, Ms. Chen was approached by her supervisor, Mr. Schade, who asked her to come to his office. She went with him, thinking he might have some paperwork for her to sign in connection with the annual performance review she received the day before. That, however, was not his purpose. Once they entered his office, Mr. Schade told her, "Someone wants to talk to you."

124.    At that moment, six FBI agents burst into his office from an adjacent conference room. One of the agents showed her an arrest warrant, as a second agent slapped handcuffs on her wrists. A third agent, whom Ms. Chen would later learn was the FBI regional supervisor, searched Ms. Chen's pockets. The remaining agents were spread out throughout the room.

125. One of the agents read the Indictment to her, and then he recited the Miranda warnings. In a state of shock, she asked them to read the Indictment again. Understandably, she could not process what was happening.

126. With her hands handcuffed behind her back, the agents walked Ms. Chen out of Mr. Schade's office, past her co-workers, and into the parking lot.

127. The agents then placed her in the backseat of an FBI vehicle. Once in the car, Ms. Chen could see her co-workers watching this scene through the office windows. She was overwhelmed with feelings of shame.

128. When they arrived at the courthouse, one of the agents showed his badge to the gatekeeper. Asked about his purpose, the agent told him they were dropping off a "prisoner." Ms. Chen could not believe what she heard.

129. The reality of what was happening to Ms. Chen sunk in as she entered the courthouse and, one by one, heavy metal doors shut behind her. After being held briefly in a solitary cell, she then was subjected to various indignities: she was fingerprinted, her mouth was swabbed for a DNA sample, and a security bracelet was affixed to her ankle.

130. Led to the courtroom in handcuffs, Ms. Chen appeared in court where the prosecutor read aloud the Indictment and announced that the maximum penalty was 25 years in prison and $1 million in fines. She was terrified.

131. Yet more reporters came to her house and the knocking on her door continued. She did not open the door again and closed the curtains.

132. Watching the television news that evening, she saw multiple stories about her arrest, which included interviews of her neighbors who expressed their shock.

133. The ensuing media coverage of her arrest and prosecution produced countless news stories, including an article in the Cincinnati Enquirer, published on or about

January 9, 2015, titled, "Wilmington scientist accused of spying for Chinese.

134.    Her reputation in tatters, she anxiously awaited trial as she and her family incurred substantial attorney fees.

135.    In the meantime, she was without a salary, as the NWS had suspended her, effective November 24, 2014.

136.    Members of Congress protested the injustice.

138.    Sherry Chen's counsel was quoted in the New York Times as saying, "How is this not a clear case of racial discrimination?"

139.    A defense committee was formed and leaders from across the country decried the prosecution of Sherry Chen including law school professors and civil rights leaders. The U.S. Civil Rights Commission protested.

140.    Sherry Chen's attorney made it clear to the U.S. Government and the agency that he believed the persecution of Ms. Chen was motivated by racial profiling in a letter to the prosecution describing Ms. Lee's May 24, 2012, email to Joanne Rutledge and noting its errors and false statements.

141.    The U.S. Attorney offered no explanation or apology after it dismissed without prejudice all of the charges against her.

142.    One day after Ms. Chen's case was dropped, on or about March 12, 2015, Ms. Lee protested to the prosecutors and leveled an entirely new accusation: "[W]hile Ms. Chen cannot be directly linked to the theft of the NID files, clear evidence exists that is was stolen in its entirety following her visit to China and obtaining worker's access to NID."

143.    On March 10, 2016  Ms. Chen received from Defendant Vice Admiral Michael S. Devany, Deputy Under Secretary for Operations, a decision to remove her from the

41

position of Hydrologist, GS1315-12, and from Federal service based on her: (1) Conduct Demonstrating Untrustworthiness; (2) Misrepresentation; (3) Misuse of a Federal Government Database; and (4) Lack of Candor with an effective date of this action was March 11, 2015, essentially the same actions dismissed two days.

144.    Ordinarily if there are performance or conduct issues with a federal employee, there is normally a progression of counseling, warning, performance improvement program, and other intermediate disciplinary actions. There was not even a hint of a problem before this notice.

145.    The effort to keep Sherry Chen from returning to work led to a  flurry of press coverage. On May 9, 2015, the New York Times published "Accused of Spying Until She Wasn't." On May 12, 2015, the Washington Post profiled Sherry Chen's story, "Falsely accused of Spying. Weather Service employee's turned upside down." On May 25, 2015, NBC News aired "Was Race a Factor in Sherry Chen's Espionage Case?"

146.    On May 21, 2015, twenty-two members of Congress wrote to Attorney General Loretta Lynch and demanded an investigation "to determine whether race was used as a factor in [Ms. Chen's] arrest.

147.    The public outcry continued. On September 15, 2015, The New York Times published "Chinese-American Cleared of Spying Charges Now Faces Firing. On November 12, 2015, there was an editorial in the Washington Post by Sherry Chen's criminal attorney Peter Zeidenberg, "Chinese Americans Are Being Caught Mistakenly in the U.S.'s Cybercrime Dragnet."

148.    Ms. Chen challenged her termination through an appeal to the U.S. Merit Systems Protection Board (MSPB).

149.    Only now the government has admitted that it knew that Sherry never shared a

42

secret with a Chinese government official. In March, 2015, the U.S. government stipulated that that it was **'unaware of any evidence that Appellant ever provided secret, classified or proprietary information to a Chinese official or anyone outside** (emphasis added)."

150.    After a three-day evidentiary hearing for her MSPB case in Cincinnati in March 2017, Chief Administrative Judge Michele Szary Schroeder issued a 135-page ruling on April 23, 2018, ordering Ms. Chen's reinstatement. A copy of the MSPB decision can be found online, including through this link: https://fas.org/sgp/news/2018/04/mspb-chen.pdf.The Administrative Judge found that the agency did not turn over exculpatory documents until her counsel discovered their existence by chance.

151.    Agreeing with Ms. Chen that she had been the "victim of a gross injustice," Judge Schroeder was highly critical of the Department of Commerce for its handling of the investigation leading to her arrest and subsequent termination of employment. Commenting on Defendant Lieberman's conclusion that Ms. Chen accessed the NID database "as a result of the request" by Mr. Jiao, the judge wrote, "[I]t is inconceivable (and I do not find credible) how . . . Agent Lieberman could reach [this] conclusion."

152.    She further asserted that "it is equally inconceivable" why the agents did not formally memorialize their 11 pages of interview notes with Ray Davis and attach them to the Report, since "[t]he responses from Mr. Davis to Agent Lieberman's questions were directly relevant to the material issues," including the "work-related reasons why Ms. Chen accessed the NID" database.

153.    The Judge questioned the legitimacy and motives behind the continuing forced leave of Sherry Chen:

        It was not my place not is it necessary or me to decide whether Ms. Furgione or

43

Admiral Devany had a blinding desire to save face for the agency in light of the press coverage and the length of time that had passed since Ms. Lee first submitted her concerns to the security office, whether they felt Ms. Chen returning to the agency would embarrass or not reflect well on the agency's initial actions, whether their thought process was tainted by the dismissed criminal charges, or whether they simply did not have the competence or experience to impartially perform their respective roles as proposing and deciding officials in this manner.

154.    The Judge concluded: "In short, Ms. Furgione and Admiral Devany seemed more concerned about being right than doing the right thing. Based on the unyielding nature of their testimony, I would not have been surprised if they rejected that 2 + 2 =4."

155.    Federal employees win 1.7 percent of the time in non-benefit cases decided by MSPB judges, yet Sherry Chen had won, but even this victory against all odds has not stopped the United States and Defendants in the malicious persecution of Sherry Chen.

156.    Despite the Congressional and community protests and calls for corrective actions, actions taken by the DOJ, and strongly worded 135-page opinion by the Chief Administrative Judge, the agency continued to press to go forward and appeal.

157.    On June 18, 2018, the Commerce agency announced it would file a petition for review. The MSPB is a three- person board which hears appeals of lower level personnel decision. It has not had a quorum since just before President Trump took office. Without a quorum it cannot hear cases. As of January 31, 2019. The office reported nearly 2000 cases pending review and another 1600 waiting for board action. Based on information and belief, a three-person board would not realistically reach Sherry Chen's case until at least 2021.

158.    The agency knew of this backlog when it appealed the 135 (135) page decision in Sherry's favor. This is public record and the subject of news coverage.

159.    The agency knew there was little chance of an overturning of a decision by the Chief Administrative Judge. MSPB's published annual report in the 5-year period ending September 30, 2018 shows that the reviewing court affirms between 92-96 percent of the decision

160.    Nonetheless, the agency appealed. In the same Notice of Appeal, the agency announced Sherry would be placed on "paid administrative leave effective April 23, 2018, while the petition for review is in process since we believe your presence in the workplace would be unduly disruptive."

161.    There was never a disciplinary action or a hint of concern with Sherry Chen's conduct while employed by the NWS. The government had already stipulated in a court document that Sherry never shared secret information. Yet the same accusation that led to the first administrative leave now arose again without an iota of evidence to support this claim again.

162.    As required by the Court's ruling vindicating her, the Department of Commerce is paying her salary and benefits, but, Sherry Chen, has not been permitted to return to work thus denying one of her opportunities to restore her reputation in the scientific community and in the community at-large.

163.    In the words of Judge Schroder, there is no reason why [Sherry] cannot continue to be a productive employee and continue to contribute to NWS's mission."

164.    As of June 7, 2019, it will be 1697 days since Sherry Chen was placed on forced leave, fired, and then place on leave again, once more, due to the unproved accusation that she was "unduly disruptive to the workplace."

165.    As of June 7, 2019, it will be 412 days since Sherry Chen was reinstated to her employment by an Administrative Judicial Order.

166.    As of June 7, 2019, it will be 276 days since the appeal was filed.

167.    When Sherry Chen was first placed on administrative leave, she was at the height of a respected and illustrious career of service to this nation. Now, she is branded "disruptive," never allowed to return to the workplace where her work was so exemplary as to merit national and local recognition.

168.    During these years, as Sherry fought to restore her name, her work, her proper place in the world, other scientists have been targeted and there is no other way but here, in a Bivens action, to sensibly address the "grotesque injustice" of it all in Judge Schroeder's words. The Sherry Chens of the world can try to defend themselves in the courts, in the public era, against fabricated accusations weaver out of the imaginations of others who see spies when they are not there. But, there must be a recognition that this destruction of innocent lives, the targeting on the basis of race and national origin, is fundamentally wrong and unconstitutional. That is why there is a Bivens action properly for Sherry Chen.

169.    Sherry Chen has lost many productive years of her career without a hearing. The internationally publicized allegations that Sherry Chen shared national security secrets turned out to be unfounded specious allegations, as the government has conceded. The government has investigated every aspect of Sherry Chen's life--writings, work, computer bank accounts, employment history and academic records—and, the government has not found an iota of evidence that Ms. Chen committed a crime in more than five years of desperately trying.

170.    The "de facto" firing enters its fifth year and shows no sign of ending. Sherry Chen has never returned to the workplace she cherished.

171.    The United States and Defendants under color of law deprived Sherry Chen of her

46

work, her liberty and, her life.

*Injuries to Sherry Chen*

172.    As a direct and proximate result of the conduct of Defendants, Sherry Chen has suffered substantial damages, including loss of liberty, invasion of privacy, substantial emotional distress and harm, including difficulty sleeping, nightmares, difficulty focusing on daily tasks, and changed behavior. In addition, Sherry Chen has suffered substantial economic damage, including loss of income and loss of future earnings, and costs and expenses in defending against false criminal charges.

173.    In causing the arrest of Sherry Chen, Defendants Lieberman, Benedict, and other unnamed Defendants were responsible for unannounced arrest of Sherry Chen at her work, in front of her colleagues.

174.    Sherry Chen, who was innocent of all of the charges against her, believed that she was being prosecuted for no legal reason but because of ethnic bias and prejudice directed at her and other Chinese-American scientists and academics who may have had contacts with colleagues in China.

175.    Sherry Chen and members of her family feared that criminal prosecution would result in her wrongful conviction and the destruction of all that Sherry Chen had built and established in her personal and professional life.

176.    The malicious prosecution of Sherry Chen was widely reported in national and international media and Sherry Chen was portrayed as an economic spy for China. Sherry Chen hid her in home in order to avoid news cameras that were attempting to film her. This publicity and the portrayal of Sherry Chen as a spy compounded her emotional distress and further damaged her reputation.

177.    As a result of the Defendants' actions, Sherry Chen has suffered from severe

emotional trauma and distress.

### COUNT I (Bivens)- Malicious Prosecution –Defendants Liebermann, Benedict

178.     Plaintiff incorporates the allegations set forth above as if fully restated herein.

179.     The actions of Defendants Benedict violated Sherry Chen's clearly established right to be free from malicious prosecution under the Fourth and Fifth Amendments of the United States constitution.

180.     The actions of Defendant Lieberman violated Sherry Chen's clearly established right to be free from malicious prosecution under the Fourth and Fifth Amendments of the United States constitution.

181.     As the lead case agents for the Department of Commerce, Office of Investigations, Defendants Lieberman and Benedict drafted a Report that contained false and misleading statements and omitted information that would have established that there was no basis on which to refer the matter to the Department of Justice for criminal investigation and to prosecute Sherry Chen for crimes that she did not commit.

182.     Sherry Chen suffered and continues to suffer from the deprivation of liberty as a result to the prosecution including but not limited to loss of work, livelihood and reputation. The charges against Sherry Chen were dismissed prior to trial, and became final on or about June 10, 2018, when the statute of limitations ran on the last remaining count in the Superseding Indictment. Accordingly, on that date the charges the United States abandoned the malicious prosecution of Sherry Chen and the matter was terminated favorably to Ms. Chen.

### COUNT II (Bivens) Equal Protection and Due Process– Defendants Lieberman, Benedict, D. Lee, Desrosiers and Does

183.     Plaintiff incorporates the allegations set forth above as if fully restated herein.

184.     Defendants Lieberman, Benedict, and Does violated Sherry Chen's clearly

48

established equal protection and due process rights under the Fifth Amendment.

185. Defendants, Lieberman and Benedict, investigation and prosecution of Sherry Chen were based on impermissible racial and ethnic factors, and specifically on Sherry Chen's ethnicity, her former status as a Chinese national, and the facts that she had traveled to China and met with a Chinese official.

186. Defendant Deborah Lee's accusations against a "Chinese national," and false and misleading testimony before the grand jury that led to the malicious prosecution of Sherry Chen was based on impermissible racial and ethnic factors, violating the Equal Protection Clause of the Fifth Amendment

187. Defendant Renee Desrosiers, who under the color of law, and in complete disregard of the Administrative Judge's Order, was listed as the contact person for the notice of Sherry's administrative leave on May 29, 2018. The notice, without an iota of evidence, stating that Sherry's "presence in the workplace would be unduly disruptive," an allegation that was patently false and went against legal and factual findings in the opinion of the administrative court opinion.

188. Defendant Does, who under the color of the law, who actively took part in the prosecution of Ms. Chen on impermissible racial and ethnic factors and refused to permit Sherry Chen to return to work, separating her from her peers and leaving her to be ostracized and isolated, violated the Due Process and Equal Protection clauses of the Constitution.

**COUNT III (BIVENS) Equal Protection and Due Process under the Fifth Amendment-
Defendants Lieberman and Benedict**

189. Plaintiff incorporates the allegations set forth above as if fully restated herein.

190. Defendants Lieberman and Benedict did violate Ms. Chen's equal protection and due process rights under the Fifth Amendment of the United States constitution by

manufacturing and intentionally misrepresenting evidence and by failing to disclose exculpatory evidence in their drafting and presentation of the inaccurate and false ROI, and upon information and belief, in other communications with Does, and with federal prosecutors.

191.    The actions of Defendants Lieberman and Lee in fabricating evidence directly caused the opening of the criminal investigation against Ms. Chen and directly led to the grand jury to vote to indict Ms. Chen.

192.    The Defendants Lieberman and Benedict in a objectively unreasonable fashion (2) stated a deliberate falsehood or showed reckless disregard of the truth and (2) that the allegedly false or omitted information was material in the finding of probable cause.

## COUNT IV (FTCA) MALICIOUS PROSECUTION

193.    Plaintiff incorporates the allegations set forth above as if fully reinstated herein.

194.    The United States maliciously did hereby institute criminal proceedings against Plaintiff.

195.    The malicious prosecution action against Ms. Chen was initiated without probable cause.

196.     On or about June 10, 2018, when the statute of limitations ran on the last remaining criminal count, the United States abandoned the prosecution and it was resolved in Ms. Chen's favor.

## COUNT V (FTCA)—ABUSE OF PROCESS

197.     Plaintiff incorporates the allegations set forth above as if fully reinstated herein.

198.    In the alternative, Plaintiff alleges abuse of process under the FTCA and Ohio law.

199.    The United States did set in motion the criminal proceeding against Ms. Chen.

200.     The proceeding was diverted to accomplish an ulterior motive for which it was not designed, to wit, to seek and obtain the conviction of prosecuting Ms. Chen, on the basis of her nationality and ethnicity.

201.     As a result of this abuse of process, the United States directly damaged Ms. Chen

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sherry Chen respectfully requests:

A.    Compensatory damages, as to Defendants Lieberman, Benedict,, D. Lee, Desrosiers, and the United States;

B.    Punitive damages to Lieberman, D. Lee and "Does" to be an amount determined at trial.

C.    Damages for her lost pay and benefits resulting throughout this period including her unpaid suspension following her arrest from November 24, 2014 through March 12, 2015.

D.    An injunction ordering the United States to permit Sherry Chen to return to work.

E.    A declaration that Defendants violated the Fourth and Fifth Amendment rights of Sherry Chen by depriving her of equal protection under the law, by subjecting her to a malicious
prosecution, abuse of process, and by subjecting her to unlawful searches and seizures;

F.    A public statement by the United States that there never was probable cause to indict Ms. Chen and her indictment was based on false and misleading representations, and omission of exculpatory evidence.

G.    An agreement between the United States and Ms. Chen, whereby the parties seek to develop anti-bias training and safeguards to prevent other Chinese-Americans and other citizens of the United States from being maliciously prosecuted based on their race and ethnicity.

H.    Reasonable attorneys' fees and costs as to all Defendants;

I.    Such other and further relief as this Court may deem just and appropriate.

Plaintiff requests a jury trial on all claims triable to a jury.

Respectfully submitted,

/s/ Michele L. Young (0062011)
Trial Attorney for Plaintiff
Michele L. Young Co., LPA
8525 Given Road,
Cincinnati, OH 45243
Tel: (513) 617-9152
michele@michelelyounglaw.com

Peter Toren – Member NY, DC, and
Cal Bars (admitted pro hac vice)
3028 Newark Street, NW
Washington, D.C. 20008
Tel: (646) 623-4654
ptoren@petertoren.com

## CERTIFICATE OF SERVICE

I hereby certify that on_____, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically.

s/ Michele L. Young
Attorney for Plaintiff